### ATLAS AIR, INC.,
**Plaintiff/Counterclaim, Defendant,**

v.

## AIR LINE PILOTS ASSOCIATION, IN-TERNATIONAL, Defendant/Counterclaim Plaintiff.

### No.  CIV.A. 99–1100(JHG).

United States District Court,
District of Columbia.

Oct. 25, 1999.

plaintiffs might have turned.

Ronald Bruce Natalie, Karen Turner McWilliams, Verner, Liipfert, Bernhard, McPherson & Hand, Chartered, Washington, DC, for Atlas Air, Inc., plaintiffs.

Marta Wagner, Airline Pilots Association, Legal Department, Herndon, VA, Marcus Charles Migliore, Air Line Pilots Association, for Air Line Pilots Association, International, defendants.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

This matter involves a dispute between the plaintiff, Atlas Air, Inc. ("Atlas"), and the defendant, Air Line Pilots Association, International ("ALPA"), concerning Atlas' denial of profit sharing payments to its recently unionized flight deck crew members pursuant to a provision in Atlas' profit sharing plan that excludes unionized employees from benefits. After ALPA was certified as the bargaining agent for Atlas flight deck crew members, Atlas, in accordance with the profit sharing plan, immediately withdrew all profit sharing benefits to the crew members. Atlas subsequently filed a declaratory judgment action in this Court seeking an order declaring that Atlas' withdrawal of benefits was not unlawful, and that Atlas is under no obligation to maintain "the status quo of the rates of pay, rules and working conditions of its flight deck crew members during negotiations toward an initial collective bargaining agreement between Atlas and ALPA." Complaint at 7.

ALPA filed a first amended counterclaim asserting (1) that Atlas improperly coerced, interfered with, discriminated against, intimidated or retaliated against the flight deck crew members for choosing to organize and bargain collectively, (2) that Atlas' request for a declaratory judgment stating Atlas has the right to make unilateral changes during the initial collective bargaining is improper in that it seeks an advisory opinion concerning unspecified future actions and, in any event, such unilateral changes are unlawful, and (3) that if the Court finds that Atlas has a right to make unilateral changes, ALPA seeks a judgment that it has the right to respond with its own self-help actions, including the right to strike.

Currently pending before the Court are three motions: ALPA's motion for a preliminary injunction restraining Atlas from continuing to deny profit sharing benefits to unionized flight deck crew members;[1] Atlas' motion to dismiss ALPA's counterclaims; ALPA's motion for summary judgment.

### I. Procedural Matters

Both parties argue this case should be resolved as a matter of law, but only ALPA has filed a formal motion for summary judgment on its counterclaims. Atlas has filed a motion to dismiss the counterclaims, but has not filed a cross motion for summary judgment on its complaint. Instead, Atlas argues in its opposition to ALPA's summary judgment motion that "Atlas, not ALPA is entitled to judgment as a matter of law that Atlas is entitled to make changes to pilots' wages and working conditions prior to entering into an initial contract," and that "ALPA's counterclaims to the contrary must be dismissed, and

1. Local Rule 205(d) states a "hearing on an application for preliminary injunction shall be set by the Court no later than 20 days after its filing, unless the Court earlier decides the motion on the papers or makes a finding that a later hearing date will not prejudice the parties." At the time the preliminary injunction motion was filed, the parties jointly requested the Court to withhold scheduling of a hearing pending the filing of a motion to dismiss by Atlas. In accordance with that request, and after concluding that a delayed hearing would cause no prejudice to either party, the court set a briefing schedule for all pleadings relating to the request for preliminary injunction and the motion to dismiss, and scheduled a hearing date for September 16, 1999. In the interim, ALPA filed an additional motion for summary judgment, which has been fully briefed. On September 10, the parties telephoned the Court and advised they would not be calling witnesses at the September 16 hearing and would rely on the affidavits submitted to the Court. The Court subsequently held a conference call with the parties and it was agreed that all three pending motions would be resolved on the papers. The Court finds that there will be no prejudice to either party by foregoing the hearing and deciding the issues on the papers.

judgment entered on Atlas's behalf." Opp. to Mot. for Summ. J. at 24.

The Court cannot decide ALPA's motion for summary judgment on its counterclaim without deciding, as a matter of law, whether Atlas was entitled to make the unilateral changes to the profit sharing plan. Thus, the Court is in the unusual position of having to make a finding as a matter of law on an issue for which summary judgment has not been formally sought. However, this Court possesses the authority to enter summary judgment *sua sponte* against a party "so long as the losing party is on notice that she had to come forward with all her evidence." *Athridge v. Rivas*, 141 F.3d 357, 361 (D.C.Cir. 1998) (citations omitted). This *sua sponte* authority is especially appropriate when one party has moved for summary judgment and there has been no cross-motion. "When there has been a motion but no cross-motion, the judge already is engaged in determining whether a genuine issue of material fact exists and the parties have been given an opportunity to present evidence designed either to support or refute the request for the entry of judgment." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2720, at 346 (3d ed.1998).

Here, both parties have exhaustively addressed the legal issues pertaining to Atlas' contention that it is entitled to make unilateral changes to the profit sharing plan. As ALPA states,

the effect of the parties' motions is to now bring before the Court all of the legal issues in this case—not only those raised by ALPA's counterclaim but also those raised in Atlas' complaint. Moreover, the parties' motion papers reveal that there are no genuine issues of material fact in this case, but only issues of law. The parties do not disagree as to what Atlas has done; they only disagree as to whether what Atlas has done is

inherently unlawful or permitted by the Railway Labor Act.

Mot. for Summ. J. at 1. Given the statements made by both ALPA and Atlas concerning the procedural posture of this case, the Court will *sua sponte* enter summary judgment in favor of Atlas and issue a judgment declaring that Atlas acted lawfully when it made unilateral changes to the profit sharing plan after ALPA was certified as the collective bargaining agent for the crew members, but before collective bargaining had commenced. The Court will dismiss for lack of jurisdiction Atlas' request for an order declaring that Atlas has no obligation to maintain the status quo during future bargaining negotiations. The dismissal of the complaint regarding future status quo obligations renders Counts II and III of the counterclaim moot.[2] Count I of the counterclaim seeks a permanent injunction enjoining Atlas from denying or continuing to deny profit sharing benefits to crew members and ordering Atlas to reinstate the profit sharing payments *nunc pro tunc* to the date of termination of the benefits. The sought after remedy is contrary to the Court's ruling that Atlas was permitted to withdraw the payments post-certification. For the reasons discussed below, Count I of the counterclaim is dismissed as moot. In addition, ALPA's motion for a preliminary injunction and for summary judgment on the counterclaim are also denied as moot.

## II. Background

The following facts, unless indicated otherwise, are undisputed. Atlas is a "cargo airline which transports goods throughout the world." Opp. to Mot. for Prelim. Inj. at 5. It has approximately 1,100 employees, about half of whom are flight deck crew members consisting of pilots and flight engineers. *See* Ebeling Decl. at ¶ 2.

---

**2.** Counts II and III of the counterclaim are contingent upon the Court's finding that Atlas is permitted under the RLA to make unilateral changes to the status quo during future bargaining negotiations.

On June 30, 1994, Michael Chowdry, Atlas' Chairman (also President and CEO), sent a letter to employees explaining that Atlas was in the process of instituting a profit sharing plan that, for the first year, would have a minimum guaranteed payment of seven percent of annual pay. *See* Allen Decl. at ¶ 5 and Attachment 1. Mr. Chowdry claimed he was instituting the guaranteed payment for the first year because he wanted employees to feel comfortable with the concept of profit sharing, especially because so many other carriers had promised profit sharing, but then failed to provide it. *See id.* He noted he was "willing to demonstrate [his] faith in [Atlas'] ability to achieve profitability by having Atlas guarantee 7% profit sharing for this, a transition year." *Id.*

The profit sharing plan, dated January 1, 1995, provided for semi-annual payments based upon the company's pre-tax profits for the period beginning June 30, 1994 through December 1995 and continuing yearly thereafter. *See* Krieger Decl. Attachment 1. Payments were due on December 15 (based on preliminary unaudited results of the year's profits), and May 15 (adjustments based on a final audit). *See id.* The plan applied only to "eligible employees," who were defined as

> any full-time (more than 20 hours per week) Employee employed by the Company who has met the requirements for participation in the Plan, except for those who are subject to a collective bargaining agreement or who have been certified by the National Mediation Board ["NMB"] or any such other regulatory agency, for representation.

*Id.* According to ALPA, at the time the profit sharing plan was implemented, no employees of Atlas were unionized and the language excluding such employees from the profit sharing plan was "understood to operate as a threat of retaliation against any employees who might exercise their statutory right to obtain union representation and bargain collectively." Mot. for Prelim. Inj. at 4; Ebeling Decl. at ¶ 7. Atlas claims the plan was not implemented to thwart union efforts as demonstrated by the fact that the entire plan, including the exclusion for unionized employees, was put into effect on July 1, 1994 before Atlas had notice or knowledge of any union organizing campaign. *See* Allen Decl. at ¶ 4. Atlas further claims that while there was a movement in late July 1994 by the Teamsters to unionize Atlas flight deck crew members, that effort ended prior to the first distribution of profit sharing checks in December 1994. *See* Allen Decl. at ¶ 6.

Although there is some indication that organizing activity occurred at Atlas as early as 1994, it was not until 1996 that "ALPA intensified its organizing drive among the Atlas flight deck crew members." Ebeling Decl. at ¶ 6. On September 30, 1996, Atlas sent a letter to all employees for the stated purpose of providing the employees "with a straightforward explanation of the profit sharing plan—how it has worked in the past and how it will work in the future." Ebeling Decl. at Attach. 1. Included with the letter was, among other things, a document entitled "Rules for Employee Eligibility." This document provided sample calculations of benefits for employees and stated that employees who were subject to a collective bargaining agreement would be excluded from the plan. *See id.* The document further noted the "exclusion is very common in unionized organizations where the compensation plans for unrepresented employees are kept separate and apart from those of unionized employees." *See id.* According to ALPA, this document was understood by Atlas employees as a threat of retaliation against employees who elected union representation. *See* Ebeling Decl. at ¶ 7.

On April 21, 1997, a letter was sent by Atlas to the flight crew members announcing a new flight crew compensation program, which included a modification to the profit sharing plan. According to the letter, the plan was implemented in response to employee concerns and questions, and was "designed to balance the needs expressed by crew members with Atlas' need

to maintain our cost competitiveness in the marketplace." Ebeling Decl. Attach. 2. The new plan provided for a guaranteed profit sharing plan of 20% for Captains and 10% for other flight crew members, regardless of company profit, for the years 1997, 1998 and 1999. *See id.* The new plan included examples of benefits based on sample pay scales. There is a notation with the first example that

> profit sharing, including the guaranteed portion, ceases upon certification of a union by the NMB. Upon certification, Atlas will review all existing and future wages and benefits, work rules and working conditions, including the 10–year pay scale; and, the foregoing will become subject to the collective bargaining process.

Ebeling Decl. Attach. 2 at 9.

According to ALPA, at the time this modified plan was announced in April 1997, "organizing efforts by ALPA were in high gear; ALPA was collecting authorization cards for a NMB representation election." Ebeling Decl. at ¶ 8. Atlas claims it was unaware of any such organizing efforts at that time. *See* Allen Decl. at ¶ 8. Atlas states that while it was aware that organizing efforts had been conducted by ALPA in the summer of 1996, in a November 11, 1996 letter addressed to Atlas air crew members, ALPA noted that the crew member response "falls short of the level we [ALPA] like to see before petitioning the National Mediation Board to conduct a secret ballot representation election." *See* Allen Decl. at Attach. 2. Atlas understood this letter to mean that "ALPA would not pursue its campaign unless this trend [an insufficient showing of interest] reversed." Allen Decl. at ¶ 8. Thus, according to Atlas, because Atlas believed in April 1997 that the ALPA campaign was over, the revisions to the profit sharing plan could not have been related to any organizing activity. [3] *Id.*

On November 14, 1997, ALPA obtained authorization from the NMB to hold a representation election. *See* Ebeling Decl. at ¶ 12. On December 2, Atlas distributed to its crew members a flight crew policy manual marked "draft—for review and comment only." Ebeling Decl. Attach. 3 at 1. In the section discussing the profit sharing plan, a table showing a ten-year salary scale, including guaranteed profit sharing payments, is included with a notice similar to the others that profit sharing ceases upon certification with the NMB. *See id.* at 22. According to ALPA, the communications from Atlas were considered to be threats that "intimidated flight crew members as they considered whether to vote for ALPA." Ebeling Decl. at ¶ 13; Fields Decl. at ¶ 2. Election ballots were subsequently issued to Atlas crew members approximately two weeks after the draft policy manual was issued. *See* Ebeling Decl. at ¶ 12. ALPA lost the election by 24 votes when the results were tallied in late January 1998. *See* Allen Decl. at ¶ 9; 25 N.M.B. 195. ALPA claims it lost the election because of Atlas' threats to discontinue profit sharing benefits. *See* Ebeling Decl. at ¶ 13. Nonetheless, no claim of election interference was brought at that time before the NMB or the Courts by ALPA or Atlas employees.

In February 1999, ALPA filed another application for representation with the NMB. *See* Ebeling Decl. at ¶ 14. On February 17, 1999, Atlas sent a letter to flight crew members for the stated purpose of providing them with some information to assist in "understand[ing] · a couple of things about collective bargaining and [the airline] business." Ebeling Decl. at Attach. 4. The letter states the collective bargaining process is "complex and emotional," with negotiations sometimes turning "confrontational." *Id.* The letter advises the flight crew members they have a

---

**3.** The November 11, 1996 letter from ALPA also notes that "[e]ven though the Organizing Committee's letter did not trigger an overwhelming response from the crew members, it did trigger a hostile—indeed, vicious—response from Atlas Air management, far exceeding what we have seen in any of our recent organizing drives." *See* Allen Decl. at Attach. 2.

right to choose union representation and the company must respect that right and bargain with the union representatives, but that Atlas has the unilateral right to change conditions of employment after certification of a union. *See id.* In bold letters, Atlas notes

> One area that will change if a union is certified is profit sharing. Our Profit Sharing Plan says clearly that employees who have been certified by the National Mediation Board for representation are *not* eligible for profit-sharing (Article 2.6, Page 1.) Of course, a union could choose to bargain for profit sharing in subsequent negotiations, but it could be years before any resolution is reached. *If a union is certified, you instantly lose your profit-sharing.*

*See id.* (emphasis in original). The letter provides some examples of potential lost profit sharing, and then notes that the "bottom line [is] you're [Atlas flight crew members] looking at trading the certainty of what you have today for the uncertainty of what a union could get for you. At the end of the day, the only thing a union can GUARANTEE is that you will be able to bargain with the company. Under Federal law, you could end up with less than you have now." *Id.* (emphasis in original).

On March 3, 1999, Chairman Chowdry wrote the flight crew members to offer his "personal perspective" on the subject of union representation. Mr. Chowdry made it clear that he was against union representation, stating "I believe that big, national labor unions are bad for our company's business, and should our employees unionize, it would negatively impact our ability to attract and retain the best customers in the business." Ebeling Decl. at Attach. 5. He advised the crew members that while it was their choice whether or not to choose union representation, they should "make no mistake [they] will immediately lose [their] profit sharing, which was 26% last year." *Id.*

Mr. Chowdry's letter was followed by a letter dated March 8, 1999 from William Allen, Vice President of Human Resources at Atlas Air, reminding Atlas flight crew members they will lose their profit sharing if they voted for union representation. Mr. Allen told the crew members that the company's "intention is to help [the crew members] make an informed decision about representation, based on the financial impact that choosing representation would have on you and your family." Ebeling Decl. at Attach. 6. What pursued after this was a virtual ping-pong of letters between Atlas and ALPA, with ALPA accusing Atlas of unlawfully threatening crew members and Atlas maintaining that its actions were merely lawful recitation of the facts. At no time during this exchange was a complaint of election interference or coercion filed by ALPA or Atlas employees with the NMB or the Courts.

The crew members ultimately voted for union representation on April 26, and ALPA was certified by the NMB on April 28, 1999. *See* Ebeling Decl. at ¶ 20. The profit sharing payments were omitted from the flight crew members' April 30 and May 15, 1999 paychecks.[4] *Id.* at ¶ 21-22. According to ALPA, Atlas has not discontinued profit sharing benefits for any other employee other than the flight crew members represented by ALPA. *See id.* at ¶ 25. To date, collective bargaining negotiations between ALPA and Atlas have not yet begun. *See* Allen Decl. at ¶ 2; Ebeling Decl. at ¶ 26.

### III. Discussion

*A. Subject Matter Jurisdiction*

Atlas has filed a complaint for declaratory relief pursuant to the Railway Labor Act, 45 U.S.C. § 151, *et seq* ("RLA"), seeking an order declaring that (1) "Atlas is under no obligation to maintain the status quo of the rates of pay, rules and working

---

4. A notice was included with the crew members' paychecks stating "as a result of the certification of ALPA as the Atlas crew member bargaining agent, effective April 26, 1999 crew members will no longer be eligible for profit sharing in accordance with Article 2.6 of the Atlas Air Profit Sharing Plan." Ebeling Decl. at Attach. 9.

conditions of its flight deck crew members during negotiations toward an initial collective bargaining agreement between Atlas and ALPA," (hereinafter referred to as "future status quo changes") and (2) that "Atlas has not violated the RLA by excluding flight deck crew members from the profit sharing plan after the NMB certified ALPA as their collective bargaining representative." (hereinafter referred to as "exclusion from profit sharing plan"). Complaint at 7.

ALPA argues the relief sought with respect to future status quo changes seeks a "blanket declaration" concerning matters that have not been identified, much less challenged in this Court. According to ALPA, "the Court lacks jurisdiction to grant Atlas a judicial blank check, which would give the Company an unfettered right to engage in all manner of future, unspecified unilateral actions throughout the course of bargaining until a final agreement is reached." Mot. for Summ. J. at 31. ALPA also argues there is no case or controversy concerning the current exclusion of crew members from the profit sharing plan because ALPA has not now challenged, nor ever threatened to challenge, Atlas' actions under the status quo provisions of the RLA, which is the basis for the declaratory complaint.[5] Instead, ALPA challenges Atlas' actions under the provisions of the RLA which prohibit interference with the employee's right to organize and bargain collectively.[6]

*Jurisdiction under the RLA*

■ The parties agree that Atlas is a common air carrier governed by the provi-

sions of the RLA. *See* 45 U.S.C. § 181. This court has jurisdiction over disputes arising under the provisions of the RLA at issue here. *See Aircraft Mechanics Fraternal Assoc. v. Atlantic Coast Airlines, Inc.*, 55 F.3d 90, 92 (2d Cir.1995); *Regional Airline Pilots Assoc. v. Wings West Airlines, Inc.*, 915 F.2d 1399, 1402 (9th Cir.1990).

*Declaratory Judgment Standard*

The Declaratory Judgment Act, 28 U.S.C. § 2201(a), states:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

■ Thus, paralleling Article III of the Constitution, the Declaratory Judgment Act requires that an "actual controversy" exist between the parties before a federal court may exercise jurisdiction over an action for a declaratory judgment. The parties agree the test for determining whether a case or controversy exists is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). *See also, Federal Express*

---

**5.** The status quo provisions of the RLA include: Section 2, First, 45 U.S.C. § 152, First, which requires carriers to make and maintain agreements concerning rates of pay and working conditions; Section 2 Seventh, 45 U.S.C. § 152 Seventh, which proscribes carriers from making changes embodied in collective bargaining agreements; Section 5 First, 45 U.S.C. § 155 First, which requires arbitration for disputes, and Section 6, 45 U.S.C. § 156, which requires, *inter alia*, carriers to give "thirty days written notice of an intended change in agreements affecting rates of pay, rules or working conditions."

**6.** These provisions involve 45 U.S.C. § 152, Section 2, Third, which provides that representatives shall be designated "without interference, influence, or coercion by either party ... and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives," and Section 2, Fourth, which makes it "unlawful for any carrier to interfere in any way with the organization of its employees ... or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization."

*Corp. v. Air Line Pilots Assoc.*, 67 F.3d 961, 963–64 (D.C.Cir.1995).

*Jurisdiction Concerning Exclusion from Profit Sharing Plan*

Atlas argues that ALPA's threats to file suit constituted "sufficient immediacy and reality" to establish declaratory judgment jurisdiction. *See Federal Express Corp.*, 67 F.3d at 965. Atlas relies on several letters from Duane E. Woerth, President of ALPA, written to Atlas during the second election in 1999, which indicate an intent on ALPA's part to "take all appropriate actions before the National Mediation Board and/or in the courts should these prove necessary to redress the Company's actions to interfere with the crew members' lawful right to unionize." Mar. 30, 1999 letter, Ebeling Decl. at Attach. 7. *See also* Mar. 22 letter from President Woerth to Atlas at *id.* ("This letter will serve as notice that ALPA will take appropriate measures to redress the company's actions that interfere with the crew members' lawful right to unionize"); Mar. 30 letter at *id.* ("While ALPA has no plans to seek to delay the upcoming election, it remains prepared to take all appropriate action to redress the Company's intimidation and coercion."). These letters are sufficient to establish a reasonable apprehension of suit on the part of Atlas.

■ ALPA argues, however, that ALPA and Atlas are disputing two different areas of the law, and therefore no justiciable controversy exists as to Atlas' claims. Atlas seeks a declaratory judgment that it was permitted under the status quo provisions of the RLA to make a unilateral change to the profit sharing benefits received by the crew members. ALPA, on the other hand, does not claim that Atlas could not withdraw the profit sharing benefits under the status quo provisions. Instead, it argues that the exclusionary provision of the policy constituted *per se* unlawful intimidation and interference under § 2, Third and Fourth of the RLA. This argument is somewhat circuitous, however, because any law suit involving one issue will inevitably involve the other. If ALPA had followed through on its threat to bring a suit for unlawful interference under the RLA, Atlas' defense would be that its actions were not coercive and intimidating because they were lawful under the status quo provisions of the RLA.[7] It is entirely reasonable for Atlas to anticipate that ALPA's claims against Atlas would include an allegation that Atlas' actions violated the status quo provisions of the RLA. Atlas can not be expected to anticipate the exact nature of ALPA's claims, and then tailor its declaratory judgment complaint accordingly. What is pertinent is that the two issues are "inextricably interrelated" in a manner such that there was a real and immediate possibility of litigation on both issues. *Cf. GNB Battery Technologies, Inc. v. Gould, Inc.*, 65 F.3d 615, 621 (7th Cir.1995). Thus, the Court finds there is a real and immediate controversy between the parties concerning both the issue of whether Atlas violated the status quo provisions, and whether Atlas' conduct constituted unlawful coercion and interference.

*Jurisdiction Concerning Future Status Quo Changes*

■ In addition to seeking a declaratory judgment that the unilateral change concerning profit sharing benefits was lawful, Atlas also seeks a declaratory judgment that any future status quo changes would be lawful as well. These future status quo changes are undefined. ALPA argues

---

7. Atlas advises the Court that its apprehension of litigation was "well-founded" because ALPA did, in fact, file a lawsuit in the United States District Court for the District of Florida a day or two after this lawsuit was filed challenging Atlas' actions as unlawful interference and coercion. That case was subsequently dismissed in light of the pending action in this Court. The Court will not consider the subsequent lawsuit as evidence of apprehension, however, because the "question of justiciability must be decided on the facts in existence at the time the suit was filed." *Federal Express Corp.*, 67 F.3d at 965 n. 5.

that speculative, undefined future actions do not meet the case or controversy requirement. The Court agrees with ALPA. As this Circuit has previously noted,

> To be 'ripe for determination' under the Declaratory Judgment Act, a 'disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on adversaries, and some useful purpose to be achieved in deciding them.'

*Danville Tobacco Assoc. v. Freeman*, 351 F.2d 832, 833–34 (D.C.Cir.1965) (quoting *Public Service Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952)). The Court must not speculate as to future unilateral changes Atlas may wish to make and whether those changes would be lawful under the RLA. Moreover, there is no indication of a real and immediate threat of litigation on any specific issue. Thus, Atlas' complaint for a declaratory judgment that "Atlas is under no obligation to maintain the status quo of the rates of pay, rules and working conditions of its flight deck crew members during negotiations toward an initial bargaining agreement between Atlas and ALPA," Complaint at 7, is hereby dismissed for lack of subject matter jurisdiction.

### B. Denial of Profit Sharing Benefits

■■■ Atlas' post-certification denial of profit sharing benefits to flight deck crew members is lawful under the RLA. The RLA imposes no duty to maintain the status quo in a case such as this where a union has been certified, but collective bargaining negotiations have not commenced and there is no prior agreement between the parties. The case law is clear that under the RLA an employer can make unilateral changes in rates of pay, rules or working conditions before commencement of the collective bargaining process. As the Supreme Court stated in *Williams v. Jacksonville Terminal*, 315 U.S. 386, 62 S.Ct. 659, 86 L.Ed. 914 (1942),

> Because the carrier was, by the [RLA], placed under the duty to exert every effort to make collective agreements it does not follow that, pending those negotiations, where no collective bargaining agreements are or have been in effect, the carrier cannot exercise its authority to arrange its business relations with its employees...

*Id.* at 402, 62 S.Ct. 659. *See also International Association of Machinists & Aerospace Workers, AFL–CIO v. Trans World Airlines, Inc.*, 839 F.2d 809, 814 (D.C.Cir. 1988) ("IAMA") ("Thus, no power to enjoin unilateral changes in working conditions by management flows from [the RLA] in the absence of pre-existing, in place, collective bargaining agreements."); *Aircraft Mechanics Fraternal Assoc. v. Atlantic Coast Airlines, Inc.*, 55 F.3d 90, 93 (2d Cir.1995) ("[The RLA] simply do[es] not impose an obligation on the carrier to maintain the status quo in the absence of an agreement."); *Regional Airline Pilots Association v. Wings West Airlines, Inc.*, 915 F.2d 1399, 1402 (9th Cir.1990) (following *Williams* and *IAMA*).[8]

ALPA's attempt to re-frame the issue as one of interference or coercion under § 2, Third and Fourth of the RLA (and its reliance on cases brought under the NLRA) is misdirected as to Atlas' post-certification conduct in denying the benefits to the flight crew members.[9] As one Court recently noted,

---

8. *International Assoc. of Machinists and Aerospace Workers v. Transportes Aereos Mercantiles Pan Americandos, S.A.*, 924 F.2d 1005, 1008 (11th Cir.1991), cited by ALPA, is distinguishable. In that case, the parties had a history of prior collective bargaining. As even that Court recognized, in situations 'pending .. negotiations, where no collective bargaining agreements are or have been in effect, the carrier' is free to make unilateral changes. (quoting *Detroit & Toledo Shore Line Ry. Co. v. United Transportation Union*, 396 U.S. 142, 153, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969)).

9. Atlas' pre-certification conduct is discussed in § IIIC. *infra.*

[*Williams, IAMA, and Atlantic Coast* all treat] the question as one of law, and hold that no violation of § 152 occurs where an employer unilaterally imposes a post-certification change of pay or conditions when no collective bargaining agreement has ever existed. The factual determination whether or not the employer's change in policy or practice was motivated by antiunion animus does not appear to be relevant to the legal analysis in *Williams* or any of the line of cases following it. Furthermore, plaintiff's citations to numerous cases governed by the National Labor Relations Act are inapposite; whether or not conduct analogous to that here alleged has been found to be unlawful under the NLRA, the cases interpreting the Railway Labor Act have found it not to violate that statute.

*Automotive, Petroleum and Allied Industries Employees Union, Local 618 v. Trans States Airlines,* 926 F.Supp. 869, 872 (E.D.Mo.1996).

Summary judgment is appropriate on this issue because there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As a result, the Court will grant summary judgment to Atlas declaring that Atlas did not violate the RLA when it excluded flight deck crew members from the profit sharing plan after ALPA was certified as the collective bargaining representative but before collective bargaining negotiations had begun.

### C. Motion to Dismiss

Atlas has filed a motion to dismiss ALPA's counterclaim. Count I of the counterclaim alleges that Atlas, in denying profit sharing benefits to flight deck crew members because of their decision to unionize, violated the RLA, § 2, Third and Fourth, which generally prohibits employers from coercing, interfering with, intimidating, or retaliating against employees who elect representation.[10] The remedy ALPA seeks under Count I is an injunction enjoining Atlas from "denying or continuing to deny eligibility [for profit sharing benefits]," ordering Atlas to immediately and retroactively reinstate the benefits, and enjoining Atlas from further interference. *See* First Amended Answer and Counterclaim at 15–16.

Counts II and III of the counterclaim contend that the Court has no subject matter jurisdiction over Atlas' request for declaratory judgment concerning future status quo changes. Count II is a contingent counterclaim, in that if the Court finds subject matter jurisdiction over the future status quo changes, ALPA seeks a declaration that such future changes would violate the procedures dictated by the RLA. Count III is also a contingent counterclaim, in that if the Court finds subject matter jurisdiction over the future status quo changes, ALPA seeks a declaration that Atlas has acted in bad faith and ALPA has the right to respond accordingly with its own self-help actions, including the right to strike. *See id.* at 13–15, 17.

### Dismissal of Counts II and III of ALPA's Counterclaim

ALPA states that if the Court denies Atlas' request for a declaratory judgment as to future changes to the status quo, Counts II and III of ALPA's counterclaims would be moot. *See* Mot. for Summ. J. at 3. The Court has dismissed Atlas' complaint as to the future status quo changes for lack of subject matter jurisdiction. Accordingly, Counts II and III of ALPA's counterclaim are dismissed as moot.

### Dismissal of Count I of ALPA's Counterclaim

The only issue remaining is whether ALPA, in light of the Court's decision that Atlas' conduct in denying benefits to union members post-certification was lawful under the RLA, still has a cause of action for

**10.** *See infra.* note 5.

interference under § 2, Third and Fourth of the RLA. Atlas seeks to dismiss the counterclaim as time-barred, arguing that the six-month statute of limitations period started running in this case prior to or as of the first election in 1998.[11] Atlas applies the discovery rule, claiming that the act which triggered the statute of limitations occurred either when Atlas first instituted the profit sharing plan with the exclusionary provision, or at least in 1998 when ALPA lost the first election allegedly due to ALPA's claims of interference and coercion.

■ ALPA argues, on the other hand, that because the very act of threatening to deny benefits to unionized employees is *per se* unlawful, this case falls under the continuing violation theory, and the statute of limitations is tolled as long as Atlas continues to deny or threaten to deny the benefits. Thus, under ALPA's theory, the statute of limitations was triggered when Atlas continued to send letters to employees up until the April 26, 1999 election, and when the benefits were discontinued in April and May 1999. The Court need not reach the statute of limitations issue, however, because ALPA's counterclaim has been rendered moot by virtue of this Court's ruling that Atlas acted lawfully when it denied the profit sharing benefits after ALPA was certified.

■ The remedy ALPA seeks for its § 2, Third and Fourth claims are (1) an injunction enjoining Atlas from denying or continuing to deny profit sharing benefits, and (2) damages in the form of reinstatement of the denied benefits *nunc pro tunc* to the date of termination of those benefits.[12] However, neither of these remedies are appropriate in light of the Court's ruling that Atlas acted lawfully in withdrawing the benefits after ALPA was certified as the bargaining agent for the flight deck

crew members. In other words, because Atlas' post-certification conduct—the withdrawal of the benefits pursuant to the profit sharing plan—was lawful, the only unlawful activity it can be accused of occurred pre-certification, prior to the 1999 election. Moreover, because there has been no collective bargaining activity, Atlas' actions could not be said to interfere with the bargaining process. Thus, Atlas' lawful actions could only be deemed unlawful if Atlas used the profit sharing exclusion to threaten or coerce flight crew members when they were considering whether or not to vote for the union. ALPA claims this effect was achieved during the first election in 1998:

> The Company's threats to significantly cut existing compensation of Atlas flight deck crew members if they chose to unionize intimidated me as I considered whether to vote for ALPA. It became apparent to me after numerous discussions with other crew members about this subject that other crew members also felt intimidated as a result of these threats. The Company's threats produced the desired effect and the majority did not vote for representation when the election ballots were tallied in late January 1998.

Ebeling Decl. at ¶ 13; *see also* Fields Decl. at ¶ 2 (same). The remedy under the RLA for pre-certification claims of harassment, coercion or interference is to petition the NMB to set aside the election results. *See* 45 U.S.C. § 152, Ninth; *Railway Labor Exec. Ass'n v. National Mediation Bd.*, 29 F.3d 655, 661 (D.C.Cir.1994); *Int'l Assoc. of Machinists & Aerospace Workers v. Northwest Airlines*, 673 F.2d 700 (3d. Cir. 1982) ("Thus, by the enactment of Section 152 Third and Fourth, Congress sought to protect employees' rights by insuring that

11. The parties agree the six-month limitations period contained in § 10(b) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(b), applies to actions under the RLA. *See Railway Labor Executives Assoc. v. Southern Railway Co.*, 860 F.2d 1038, 1041 (11th Cir.1988); *Robinson v. Pan American World*

*Airways, Inc.*, 777 F.2d 84, 88 (2d Cir.1985); *Benoni v. Boston and Maine Corp.*, 828 F.2d 52, 56 (1st Cir.1987).

12. ALPA has withdrawn its request for punitive damages. *See* Mot. for Summ. J. at 3.

employees' designation of bargaining representatives would be free from employer coercion or interference. To further that goal, the [NMB] was empowered to resolve representational disputes by investigation and certification of the representative that reflected the unfettered choice of the employees."). However, ALPA did not seek that remedy when it lost the first election in 1998 and it certainly is not asking for it now.

ALPA's position that it is entitled to injunctive and monetary relief is unsupportable. This case is fundamentally different from the typical case alleging antiunion animus where employees are discharged or furloughed post-certification due to pro union activity. In that situation, the Court can fashion a remedy such as reinstatement or injunctive relief prohibiting the carrier from discharging pro-union employees. Here, it is obvious there can be no such remedy because the remedy sought would punish conduct the Court has declared lawful.

In *Association of Flight Attendants, AFL–CIO v. America West Airlines,* 1996 WL 1098791, No. CIV–96–1043, Mem. Op. and Order (D.Arizona, Dec. 17, 1996), cited by ALPA, the carrier froze pension benefits after certification of the union, and after the bargaining process had begun. The union complained that the actions of the carrier in threatening to withdraw the benefits interfered with the bargaining process in violation of § 2, Third and Fourth of the RLA. The carrier argued that the withdrawal of the benefits was lawful because the employer was free to make unilateral changes to benefits prior to the first collective bargaining agreement. The Court noted the union was not alleging the withdrawal of benefits was unlawful. Instead, the Court observed the union had "challenged an otherwise lawful unilateral change on the grounds that it became unlawful when America West decided to deny [the benefits] to its unionized employees only." *America West,* Mem Op. and Order at 17, 1996 WL 1098791 (internal citations omitted). The Court held the union had stated a claim for relief

under § 2, Third and Fourth. However, a critical distinction in *America West* is that the negotiations process had already begun between the union and the carrier when the carrier decided to withdraw the benefits. Unlike the case at bar—where the allegedly illegal conduct occurred during the election process—the *America West* conduct occurred during the bargaining process. *See also Air Line Pilots Association, Int'l v. Transamerica Airlines, Inc.,* 817 F.2d 510 (9th Cir.1987). Here, the bargaining process has not begun. Count I of ALPA's counterclaim must be dismissed as moot in light of the ruling today that Atlas' post-certification withdrawal of benefits was lawful under the RLA.

### D.   Motion for Summary Judgment

ALPA's motion for summary judgment is denied as moot in light of the above.

### E.   Motion for Preliminary Injunction

ALPA's motion for preliminary injunction is denied as moot in light of the above.

### IV.   Conclusion

For the reasons discussed above, it is hereby

**ORDERED** that summary judgment be and is hereby granted to Atlas on the issue of whether its denial of profit sharing benefits to unionized flight deck crew members was lawful under the RLA. Atlas did not violate the RLA when it denied profit sharing benefits to the flight deck crew members after ALPA was certified as the collective bargaining agent and before collective bargaining negotiations had begun; and it is

**FURTHER ORDERED** that Atlas' remaining claim that it was "under no obligation to maintain the status quo of the rates of pay, rules and working conditions of its flight deck crew members during negotiations toward an initial collective bargaining agreement between Atlas and

ALPA" is hereby dismissed for lack of jurisdiction; and it is

**FURTHER ORDERED** that ALPA's entire counterclaim is dismissed as moot; and it is

**FURTHER ORDERED** that ALPA's motion for summary judgment is denied as moot; and it is

**FURTHER ORDERED** that ALPA's motion for a preliminary injunction is denied as moot.

IT IS SO ORDERED.

## ORDER

In light of the Court's Memorandum Opinion and Order and Judgment issued this date, it is hereby

**ORDERED** that the parties' Joint Stipulation and Motion for Extension of Discovery Deadline is denied as moot.

IT IS SO ORDERED.