ATLAS AIR, INC., Appellee/Cross–
Appellant,

v.

AIR LINE PILOTS ASSOCIATION,
Appellant/Cross–Appellee.

Nos. 99–7223 & 99–7243.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 2, 2000.

Decided Nov. 21, 2000.

Marcus C. Migliore argued the cause for appellant/cross–appellee. With him on the briefs were Jerry D. Anker and Jonathan A. Cohen. Marta Wagner entered an appearance.

Ronald B. Natalie argued the cause for appellee/cross–appellant. With him on the briefs was Douglas W. Hall.

Before: GINSBURG, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

The cockpit crewmembers employed by Appellee Atlas Air, Inc. elected to unionize, whereupon Atlas Air immediately terminated their participation in its profit-sharing plan. Atlas sought a declaratory judgment that its action was a legal modification of status quo employment conditions under the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*, and that Atlas was free to make further status quo changes pending the onset of collective bargaining. The Air Line Pilots Association, International (ALPA) filed a cross-claim charging that Atlas Air's maintenance and execution of a discriminatory anti-union policy violates RLA Section 2, Third and Fourth. The district court granted summary judg-

ment for Atlas Air on the grounds that the RLA does not require carriers to maintain status quo wages, work rules, or conditions of employment. *See Atlas Air, Inc. v. ALPA,* 69 F.Supp.2d 155, 159 (D.D.C. 1999). The court further held that it lacked jurisdiction to hear Atlas's second claim because it was insufficiently concrete. *See id.* at 164. ALPA and Atlas each appeal. Because the RLA prohibits carriers from interfering with, coercing, or influencing employee decisions whether to unionize, we reverse and remand to the district court for further proceedings.

## I. Background

### A.

Atlas Air, Inc. (Atlas) is a cargo airline. Of Atlas's approximately 1,100 employees, about half are cockpit crewmembers (pilots and flight engineers). In June 1994, Atlas announced a new compensation package which included profit-sharing. Under this plan, "eligible employees" would receive semiannual payments based upon the company's profits. To ensure that employees would receive additional income under the plan, Atlas set a minimum guaranteed payment of seven percent of annual pay. Under the plan, the definition of "eligible employee" excludes "those who are subject to a collective bargaining agreement or who have been certified by the National Mediation Board or any such other regulatory agency for representation." This provision was publicized to Atlas employees along with information about the rest of the plan's terms.

ALPA began efforts to organize cockpit crewmembers at Atlas Air perhaps as early as 1994. *See Atlas,* 69 F.Supp.2d at 159. These efforts intensified in 1996. On September 30, 1996, Atlas sent a letter to all of its employees providing a "straightforward explanation of the profit-sharing plan." A document enclosed with the letter outlined the eligibility rules and provided sample calculations of likely benefits from the plan. The document also provid-

ed an explanation for the eligibility rules, noting that the exclusion of unionized employees is "very common in unionized organizations where the compensation plans for unrepresented employees are kept separate from those of unionized employees."

On April 21, 1997, Atlas announced that it was revising the profit-sharing plan. In particular, for the next three years Atlas would guarantee eligible employees a minimum profit-sharing payment of 10 percent of annual pay, irrespective of profits (20 percent for captains). Atlas's announcement of the new plan, mailed to all crewmembers, noted that profit sharing would end "upon certification of a union" and that all employment rules and compensation provisions, including "existing and future wages and benefits" would "become subject to the collective bargaining process," if a union were certified.

ALPA filed its first application for a representation election for Atlas crewmembers in November 1997. Shortly thereafter, Atlas distributed a draft Flight Crew Policy Manual that outlined the profit-sharing eligibility rules. According to the manual, "profit sharing, including the guaranteed portion, ceases upon certification of a union." Draft Flight Crew Policy Manual at 21. The draft manual also included a chart illustrating the guaranteed minimum payments that employees could expect so long as they remained eligible for the profit-sharing plan. At the time, ALPA did not question the legality of the eligibility provision of Atlas's profit-sharing plan. ALPA lost the 1997 representation election. It did not, however, file any objections to the election related to the profit-sharing plan eligibility requirements or otherwise.

ALPA and the International Brotherhood of Teamsters each filed for a second election in February 1999. On February 17, Atlas sent a letter to all crewmembers explaining the potential consequences of unionization. While noting that employees have the right to choose union representation, it also stated that Atlas unilaterally could change the conditions of employment if a union were to be certified. In bold face type, the letter declared:

One area that will change if a union is certified is profit sharing. Our Profit Sharing Plan says clearly that employees who have been certified by the National Mediation Board for representation are *not* eligible for profit-sharing.... Of course, a union could choose to bargain for profit sharing in subsequent negotiations, but it could be years before any resolution is reached.

*If a union is certified, you instantly lose your profit sharing.* If anyone promises you that you can keep your profit-sharing should a union be certified—they're either seriously mistaken, or they're intentionally misleading you.

(Emphasis in original.) The letter further noted that "[t]he loss of profit sharing could have a significant financial impact on you and your family" and included a chart detailing the likely impact of the plan's termination on the salaries earned by employees of varying levels of seniority.

In March, Atlas executives sent additional letters to crewmembers reiterating the consequences of union certification. According to one of the letters, Atlas wanted to ensure that crewmembers made "an informed decision about representation, based on the financial impact that choosing representation would have on you and your family." "So there is no misunderstanding," one of the letters explained, "a portion of your current paycheck will stop being paid if the NMB [National Mediation Board] certifies a union." The letter noted that all cockpit crewmembers stood to lose at least 10 percent of their annual pay should they lose eligibility. Given Atlas Air's substantial profits in recent years, the document noted the cost of unionization could be much higher.

Despite Atlas's letters, ALPA won the representation election held on April 26. Two days later, the NMB certified ALPA

as the collective bargaining representative. Upon the announcement of the election results, but before the NMB certification, Atlas terminated the profit-sharing plan for cockpit crewmembers. The plan's termination reduced cockpit crewmembers' annual compensation by over 25 percent. The profit-sharing plan remained in place for Atlas employees without union representation. At the time this suit was instituted, Atlas and ALPA had yet to enter into any contract negotiations.

### B.

On May 5, 1999, Atlas Air filed suit seeking a declaratory judgment that its enforcement of the profit-sharing plan's eligibility requirements was lawful under the Railway Labor Act (RLA), 45 U.S.C. § 151 et seq., and that under the RLA Atlas "retains the right to make unilateral changes in the rates of pay, rules and working conditions of its flight deck crewmembers while it negotiates the terms of an initial collective bargaining agreement with ALPA." Complaint at 1. ALPA filed a counterclaim asserting that the exclusionary provisions of the profit-sharing plan constituted unlawful interference with the right to organize under Section 2, Third and Fourth of the RLA. See 45 U.S.C. § 152, Third and Fourth. ALPA also contended that Atlas's request for a declaratory judgment that Atlas could make additional unilateral changes in working commitments was not ripe for adjudication or, in the alternative, that ALPA has the right under the RLA to respond to any such changes with a strike or other self-help actions. ALPA also moved for a preliminary injunction alleging that Atlas's "discriminatory conduct" was per se unlawful under federal labor law. Atlas responded with a motion to dismiss and ALPA filed a motion for summary judgment on the counterclaim.

On October 25, 1999, the district court entered summary judgment on behalf of Atlas, holding that the company did not violate the RLA by enforcing the eligibility provisions of the profit-sharing plan after ALPA was certified and before the start of negotiations. Although Atlas had not itself moved for summary judgment, the trial court entered summary judgment sua sponte because both parties' submissions made clear that there were no genuine issues of material fact in the case. Atlas, 69 F.Supp.2d at 158. The court held that the RLA "imposes no duty to maintain the status quo in a case such as this where a union has been certified, but collective bargaining negotiations have not commenced and there is no prior agreement between the parties." See id. at 164.

The court dismissed Atlas's second claim for lack of subject matter jurisdiction. The court agreed with ALPA that a declaratory judgment on the lawfulness of future, unspecified status quo changes under the RLA did not present a justiciable case or controversy. Finally, the court dismissed ALPA's counterclaim, motion for summary judgment, and motion for a preliminary injunction as moot in light of its other decisions.

ALPA appealed the court's ruling in favor of Atlas and Atlas filed a cross-appeal challenging the court's holding that it lacked subject matter jurisdiction over Atlas's broader claims.

## II. Discussion

■ This case comes to us on an appeal and cross-appeal from a motion for summary judgment. Therefore, our review of all issues raised by either party is de novo. See, e.g., Cone v. Caldera, 223 F.3d 789, 793 (D.C.Cir.2000) (court reviews cross-motions for summary judgment de novo); Frizelle v. Slater, 111 F.3d 172, 176 (D.C.Cir.1997) (grant of summary judgment reviewed de novo); Shields v. Eli Lilly and Co., 895 F.2d 1463, 1466 (D.C.Cir.1990) (same).

### A. The Profit–Sharing Plan Exclusion

#### 1. Status Quo Obligations under the RLA

Atlas Air's claim and the district court's judgment are based on the proposition

that the Railway Labor Act imposes no obligation upon carriers to maintain status quo wages, rules or working conditions after the certification of a union but before the onset of collective bargaining. RLA Section 2, Seventh, for instance, provides:

No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

45 U.S.C. § 152, Seventh. RLA Section 6 requires that employers and employee representatives "shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions...." *Id.* § 156.

By their express terms, these so-called "status quo" provisions of the Act only prohibit unilateral changes in wages or working conditions where there is a preexisting collective bargaining agreement. *See Williams v. Jacksonville Terminal Co.*, 315 U.S. 386, 402–03, 62 S.Ct. 659, 86 L.Ed. 914 (1942) ("The prohibitions of § 6 against change of wages or conditions pending bargaining and those of § 2, Seventh, are aimed at preventing changes in conditions previously fixed by collective bargaining agreements."); *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 158, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969) (status quo changes in working conditions prior to collective bargaining are permissible where there is "absolutely no prior history of any collective bargaining or agreement between the parties on any matter"). As this Court recognized in *International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Trans World Airlines*, "no power to enjoin unilateral changes in working conditions by management flows from Section 6 of the Act in the absence of pre-existing, in place, collective bargaining agreements." 839 F.2d 809, 814 (D.C.Cir.1988).[1] Other cir-

cuits have reached the same conclusion. *See Aircraft Mechanics Fraternal Ass'n v. Atlantic Coast Airlines, Inc.*, 55 F.3d 90, 93 (2d Cir.1995) (The RLA "simply do[es] not impose an obligation on the carrier to maintain the status quo in the *absence* of an agreement."); *Regional Airline Pilots Ass'n v. Wings West Airlines, Inc.*, 915 F.2d 1399, 1402 (9th Cir.1990). *Cf. International Ass'n of Machinists and Aerospace Workers v. Transportes Aereos Mercantiles Pan Americandos, S.A.*, 924 F.2d 1005, 1007 (11th Cir.1991) (RLA precludes status quo changes once collective bargaining has begun). *But cf. Aircraft Mechanics Fraternal Ass'n v. Atlantic Coast Airlines, Inc.*, 55 F.3d 90, 92 (2nd Cir.1995) ("The question presented in this lawsuit is whether [certain unilateral changes in conditions of employment] are allowed after bargaining has commenced ... but before an agreement is reached. We answer the question in the affirmative.").

On the basis of these decisions the district court below ruled that the Railway Labor Act "imposes no duty to maintain the status quo in a case such as this where a union has been certified, but collective bargaining negotiations have not commenced and there is no prior agreement between the parties." *Atlas*, 69 F.Supp.2d at 164. This is no doubt true. Section 2, Seventh and Section 6 do not require carriers to maintain status quo working conditions. But, the lack of a status quo obligation under the RLA does not mean that *any* change in the status quo is *per se* legal. A carrier's action may violate other rights or obligations fixed by the RLA.

**2. RLA Section 2, Third and Fourth**

The lack of an enumerated obligation to maintain the status quo pending the negotiation of a collective bargaining agreement does not absolve an employer from its obligation to refrain from activities which undermine employees' rights. The

---

1. Other courts have evidenced much less willingness to review claims under §§ 152, Third and Fourth in the post-certification context.

*See, e.g., Wightman v. Springfield Terminal Railway Co.*, 100 F.3d 228, 235 (1st Cir.1996).

RLA bars employers from engaging in discriminatory actions designed to impede or inhibit employees' exercise of their right to organize for collective bargaining purposes. For this reason, "the real question" in this case "is whether ... the carrier has discriminated against its employees because they have engaged in activities protected by the RLA...." *Railway Labor Executives' Ass'n v. Boston & Maine Corp.*, 808 F.2d 150, 157 (1st Cir.1986).

Section 1a(2) of the Act "forbid[s] any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the rights of employees to join a labor organization." 45 U.S.C. § 151a(2). Section 2 of the RLA fleshes out this protection. Section 2, Third provides that employees may select their representatives "without interference, influence, or coercion" of "any" kind. *Id.* § 152, Third. Section 2, Fourth further provides that:

> No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees ... or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization....

*Id.* § 152, Fourth. "These provisions prohibit employers from interfering with, coercing or influencing the representational choices of workers and from interfering with the right of employees to organize in labor unions." *ALPA v. Eastern Air Lines, Inc.*, 863 F.2d 891, 893 (D.C.Cir. 1988).

In *Eastern*, the carrier sought to modify its flight schedule and furlough over 3,000 employees, the majority of whom were represented by ALPA or other unions. Eastern Air Lines was in substantial financial difficulty at the time, and the changes would reduce its monthly payroll expenses by nearly $7 million. *See id.* at 893. The

unions challenged this plan alleging, among other things, that it violated Section 2, Third and Fourth of the RLA. We rejected ALPA's claims because the carrier had legitimate business motivations independent of any effort to discourage employees from exercising their rights under the RLA, stating that "[w]orkers' Railway Labor Act rights to unionize are adequately protected so long as management is limited to taking only measures that it would have taken in the absence of any anti-union animus." *Id.* at 902.

ALPA argues that *Eastern* is distinguishable from the present case because the challenged policy did not "impose a differential impact on union members." *Id.* at 903. Atlas can make no such claim about the profit-sharing plan eligibility requirements or its decision to terminate plan participation for flight crewmembers. In addition, ALPA contends, *Eastern* reaffirms precedent from other circuits that employers cannot make changes in status quo working conditions that are anti-union in motivation or effect.

ALPA argues there is a "class of antiunion acts that are 'inherently destructive' of important employee interests, so that 'no proof of anti-union motivation is needed.'" *Eastern*, 863 F.2d at 902 (quoting *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967)). Following the Supreme Court's teaching in *Great Dane*, the Sixth Circuit found an exclusionary eligibility requirement for a voluntary retirement savings and profit-sharing plan to be "inherently destructive" of employee rights and *per se* unlawful under the National Labor Relations Act (NLRA). *Kroger Co. v. NLRB*, 401 F.2d 682, 686–89 (6th Cir.1968). The Sixth Circuit held that the policy "would naturally have some deterring effect on union membership." *Id.* at 686. As a result, the policy was deemed facially invalid; the court required no showing of anti-union animus. Other courts have reached similar conclusions under the NLRA. *See, e.g., AMF Bowling Co. v.*

*NLRB,* 977 F.2d 141, 145 (4th Cir.1992) (termination of a severance-pay plan upon an employee becoming a "member of a bargaining unit" violates the NLRA); *Melville Confections, Inc. v. NLRB,* 327 F.2d 689, 691–92 (7th Cir.1964) (exclusion of union–represented employees from profit-sharing plan is *per se* violation of the NLRA). The National Labor Relations Board also follows this interpretation. *See, e.g., E & L Plastics Corp.,* 305 N.L.R.B. 1119, 1119–20, 1992 WL 8700 (1992); *AMF Bowling Co.,* 303 N.L.R.B. 167, 170, 1991 WL 135220 (1991), *enforced in relevant part,* 977 F.2d 141, 145 (4th Cir.1992); *Niagara Wires, Inc.,* 240 N.L.R.B. 1326, 1327–28, 1979 WL 8822 (1979).

In *Eastern* we did not hold the carrier's actions to be "inherently destructive" because there was no claim that the policy "impose[d] a differential impact on union members." *Eastern,* 863 F.2d at 903. "The vast majority of acts found 'inherently destructive'" have been those, like the actions of Atlas Air, that "discriminate solely on the basis of union membership." *Id.* at 902; *see, e.g., NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967) (unjustified failure to reinstate ex-strikers held unlawful without reference to employer's intent); *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963) (grant of super–seniority to strike replacements and workers coming off the strike held inherently destructive); *C. H. Heist Corp. v. NLRB,* 657 F.2d 178 (7th Cir.1981) (disparate treatment of union officials held to be inherently destructive); *Kroger,* 401 F.2d at 682 (action denying union members access to profit-sharing plan held unlawful without showing of anti-union animus).

■ As we noted above, the "inherently destructive" precedents all arose under the NLRA, not the RLA. While the two laws are not equivalent, we have interpreted the respective provisions barring undue employer influence of employees as meaning "pretty much the same thing." *US Air-*

*ways, Inc. v. NMB,* 177 F.3d 985, 991 (D.C.Cir.1999). Despite the statutory differences, "carefully drawn analogies from the federal common labor law developed under the NLRA may be helpful in deciding cases under the RLA." *Trans World Airlines, Inc. v. Independent Fed'n of Flight Attendants,* 489 U.S. 426, 432, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989); *see id.* at 432–34, 109 S.Ct. 1225 (applying NLRA precedents to interpret RLA Section 2, Fourth). "While of course NLRA precedents may not be casually transferred to the RLA context" given the severe impact of Atlas Air's actions on its newly unionized employees we see "no reason why the latter requires us to cast a more jaundiced eye on efforts to exert economic pressure than the former." *Eastern,* 863 F.2d at 909.

■ Atlas Air adopted a facially discriminatory policy that penalized employees by terminating their participation in profit sharing for no other reason than their decision to unionize. Prior to the election of ALPA as the crewmembers' bargaining representative, Atlas repeatedly threatened its employees with a substantial decrease in compensation that would have a real and material impact on the conditions of employment. In case there was any confusion about the magnitude of the loss that would result upon certification of a union, Atlas distributed documents detailing the amount of income at stake. Then, upon learning of ALPA's election, Atlas *immediately fulfilled* its threat and terminated the profit-sharing plan before the results had even been certified. It is difficult to view these actions as anything other than the sort of "interference, influence, or coercion" explicitly barred by the RLA.

■ In reaching this conclusion we need not decide whether there is a broad class of inherently destructive acts that are *per se* illegal under the RLA. That is, even without importing NLRA precedent with full force into the RLA context, we

find instructive the concept that the very nature of actions against unionized labor by an employer can in and of itself provide evidence of the animus generating those acts. While we continue to recognize that the employer may alter status quo working conditions, so long as no collective bargaining agreement exists between the parties, where the challenged modification to the status quo is far from merely formal, and is in fact the equivalent of a substantial decrease in compensation having a real and material impact on the conditions of employment, and is justified on no other grounds than union certification, we may presume that the carrier's actions were motivated by anti-union animus and are in violation of RLA Section 2, Third and Fourth. To hold otherwise would allow a carrier, without legal consequence, to slash to subsistence levels the wages of those employees who elect to unionize. Were we to allow such a result, the RLA provisions "prohibit[ing] employers from interfering with, coercing or influencing the representational choices of workers and from interfering with the right of employees to organize in labor unions" would no longer be effective. *Eastern*, 863 F.2d at 893. While carriers retain the right to make unilateral changes in status quo working conditions, so long as there is no collective bargaining agreement, they may not make such changes which selectively penalize unionized employees so as to interfere with, coerce, or influence their decision to exercise their rights under the RLA.

3. Statute of Limitations

■ Atlas posits that ALPA's claim under the RLA is time-barred and that this provides an alternative ground upon which to uphold the district court's grant of summary judgment. The statute of limitations for the RLA, borrowed from section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), is six months. *See West v. Conrail*, 481 U.S. 35, 107 S.Ct. 1538, 95 L.Ed.2d 32 (1987). According to Atlas, ALPA's claim accrued either upon the initial imposition of the profit-sharing plan,

or no later than January 1998 when ALPA lost its initial representative election. In either case, ALPA's claim would be time-barred.

■ "A claim normally accrues when the factual and legal prerequisites for filing a suit are in place." *3M Co. v. Browner*, 17 F.3d 1453, 1460 (D.C.Cir.1994). Were ALPA's claim solely based upon the actions taken by Atlas prior to the 1999 certification election, it would be time-barred. However, under the NLRA, from which the RLA borrows its statute of limitations, the *maintenance* of exclusionary clauses in employee benefit plans has been held to constitute a violation. *See, e.g., Kroger Co.*, 164 N.L.R.B. 362, 363, 376, 1967 WL 18728 (1967), *enforced in relevant part*, 401 F.2d 682 (6th Cir.1968); *Melville Confections, Inc.*, 142 N.L.R.B. 1334, 1339, 1963 WL 16708 (1963), *enforced*, 327 F.2d 689, 690 (7th Cir.1964) ("The Board found that the company violated Section 8(a)(1) of the Act *by maintaining and continuing to maintain* a profit-sharing plan . . . which required as a condition precedent to participation . . . that the employee not be represented by a labor organization for the purposes of collective bargaining." (emphasis added and footnote omitted)); *id.* at 692 ("Nor does the fact that the company's violation antedated the Section 10(b) period applicable to the instant charge preclude a finding of a violation which occurred through a continuation of the proscribed conduct during and within the six-month period prior to the filing of the charge."). Thus, Atlas Air's continued reliance upon its exclusionary eligibility policy, and repeated threats to enforce this policy should the crewmembers exercise their right to unionize, constitutes a continuing violation under the applicable case law.

■ Therefore, ALPA's claims are still clearly alive. As the Supreme Court noted interpreting section 10(b) of the NLRA:

[W]here occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices.... earlier events may be utilized to shed light on the true character of matters occurring within the limitations period.... *Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 416, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960); *see also id.* at 416–17, 80 S.Ct. 822 (distinguishing the above from cases in which "conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice"); *International Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. NLRB*, 363 F.2d 702, 706–07 (D.C.Cir. 1966) (claim not time-barred where unfair labor practice "started more than six months prior to the charge" was "carried forward by more recent actions"). In the case at bar, Atlas committed violations within the limitations period by, among other things, repeatedly threatening to terminate profit sharing for employees that elect to unionize and its immediate severance of represented unit members from the profit-sharing plan upon learning that ALPA won the election. Under *Local Lodge No. 1424*, this is sufficient to prevent ALPA's claims from being time-barred.

## B. Atlas Air's Cross–Appeal

██ Atlas cross-appeals the district court's dismissal of its additional claim for a declaratory judgment that it retained the right to make additional unilateral changes to salary and working conditions prior to the ratification of a collective bargaining agreement. There is no subject matter jurisdiction for this claim.

██ Under the Declaratory Judgment Act, a dispute "must not be nebulous or contingent but must have taken on fixed and final shape." *Danville Tobacco Ass'n v. Freeman*, 351 F.2d 832, 833–34 (D.C.Cir. 1965) (quoting *Public Service Comm'n v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236,

97 L.Ed. 291 (1952)); *see also Federal Express Corp. v. ALPA*, 67 F.3d 961 (D.C.Cir.1995) (finding no concrete legal dispute in airline's suit for declaratory judgment that unopposed changes in status quo working conditions were protected under the RLA). That a union may posture in labor negotiations or otherwise threaten to respond to future changes is insufficient to create the reasonable apprehension of litigation necessary for the claim to be justiciable. *See id.* at 964–65. Thus the district court correctly dismissed Atlas's additional claims for lack of subject matter jurisdiction on the grounds that it "must not speculate as to future unilateral changes Atlas may wish to make and whether those changes would be lawful under the RLA." *Atlas*, 69 F.Supp.2d at 164.

## III. Conclusion

Atlas Air violated the RLA by dramatically cutting the take-home pay of its cockpit crewmembers for the sole reason that they exercised their statutory right to unionize. Such an action is not protected by the status quo provisions of the RLA. Consequently, the district court's grant of summary judgment for Atlas Air is reversed and this case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*