AIR LINE PILOTS ASSOCIATION, INTERNATIONAL

v.

GUILFORD TRANSPORTATION INDUSTRIES, INC., Pan American Airways Corp., Boston–Main Airways Corp.

No. CIV.04–331–JD.

United States District Court, D. New Hampshire.

Oct. 13, 2004.

Andrew W. Serell, Rath Young & Pignatelli, P.A., Concord, NH, Julie P. Glass, Marcus C. Migliore, Air Line Pilots Ass'n, Washington, DC, for Plaintiff.

Eric L. Hirschhorn, Joseph E. Schuler, William G. Miossi, Winston & Strawn LLP, Washington DC, R. Matthew Cairns, Marie M. McPartlin, Ransmeier & Spellman, Concord, NH, for Defendants.

## ORDER

DICLERICO, District Judge.

The defendants, Guilford Transportation Industries, Inc. ("Guilford"), Pan American Airways Corp. ("Pan Am"), and Boston–Maine Airways Corp. ("Boston–Maine"), object to the magistrate's report and recommendation ("R & R") that an injunction issue against them pursuant to the Railway Labor Act, 45 U.S.C. § 152 ("the RLA"). The plaintiff, Airline Pilots Association, International ("ALPA") has filed a response to the objection.

### Standard of Review

ALPA's "motion for temporary restraining order and preliminary injunction" was referred to the magistrate under 28 U.S.C. § 636(b)(1)(b) to conduct an evidentiary hearing and to submit proposed findings of fact and recommendations for the disposition of the motion. This court must therefore conduct de novo review of the report and recommendation. Fed.R.Civ.P. 72(b); 14 James Wm. Moore *et al.*, *Moore's Federal Practice* § 72.02[9], at 72–18 (3d ed.2004). Following this review, the court "may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions." Fed.R.Civ.P. 72(b); *see also* 28 U.S.C. § 636(b)(1)(c).

Although the de novo standard does not compel a new hearing, the court "must give fresh consideration to those issues to which specific objections have been made." 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure* § 3072.2, at 374 (2d ed.1997) (internal quotation marks and footnote omitted); *accord Gioiosa v. United States*, 684 F.2d 176, 178 (1st Cir.1982). Fresh consideration includes "at least, reading the transcripts of the testimony that relates to the objected-to portions of the magistrate judge's report." *Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 147 (3rd Cir.1993); *see also R.I. Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 99 F.Supp.2d 174, 176–77 (D.R.I.2000). With these principles in mind, the court turns to the defendants' objections.

### Background [1]

ALPA brought this action to, *inter alia*, prevent the defendants from transferring

---

1. The defendants concede that "[m]ost of the findings of fact in the [R & R] are supported by the record." Def. Obj. at 7. The following facts are therefore adopted from the R & R. Nevertheless, the defendants purport to object to the magistrate's recommended findings *"in their totality* on the grounds that they include facts that are insufficient to support the recommended order and *omit* numerous material facts that are undisputed and demonstrate conclusively that ALPA failed to meet its burden of proof ...." *Id.* Whether the findings support the recommended order as a matter of law is considered in the "Discussion" section, *infra.* To the extent the court considers any of the facts omitted from the R & R

the work of flying B–727 passenger aircraft from Pan Am to Boston–Maine. Although Pan Am has a collective bargaining agreement ("the CBA") in place with ALPA, who represents the majority of its pilots, the pilots of Boston–Maine are not unionized. Pan–Am and Boston–Maine are subsidiaries of the same parent company, Pan American Airlines, Inc. Guilford does not have any ownership interest in either Pan–Am or Boston–Maine, but leases 727s to both companies. Neither Boston–Maine nor Guilford is a party to the CBA.

Pan American Airlines, Inc., acquired the assets of Pan Am following its bankruptcy in June 1998. Boston–Maine was formed as a wholly owned subsidiary of Pan American Airlines, Inc., in March, 1999. Since it was acquired, Pan Am has been losing money and has furloughed approximately two-thirds of the pilots it once employed. Similarly, Boston–Maine has never turned a profit, although its operations have expanded. Pan Am notified the Federal Aviation Administration in June 2004, that it intended to cease operations by October 31, 2004.

Although Pan Am has different personnel from Boston–Maine serving as the directors of various aspects of Pan Am's operations, the two entities have the same president, chief financial officer, and general counsel.[2] Boston–Maine has hired a number of former Pan Am employees (including some into management-level positions), has used Pan Am employees to train Boston–Maine workers, and has specifically solicited job applications from Pan Am flight attendants.[3] While Boston–Maine maintains its own operating specifi-cations, procedures, facilities, programs, and accounts, it entered into a "support services and facilities agreement" with Pan Am in October 2001. Pan Am and Boston–Maine also operate a joint reservation system accessible from either company's website, and a route map on the Boston–Maine website includes Pan Am service (albeit in a different color from that of the Boston–Maine routes).

The magistrate heard testimony from Linda Toth, one of Pan Am's former regional managers, relating certain conversations with David Fink, the president of Pan Am, Boston–Maine, and Guilford. According to Toth, Fink regularly expressed his dislike for ALPA and even said in March or April 2004, that "it was going to be smooth sailing with Boston–Maine as soon as they got rid of all those union jackasses and life would be so much easier …." Tr. Inj. Hrg. at 78:3–19 (Sept. 9, 2004). Toth also related Fink's statement that all of Pan Am's aircraft would soon be flying under the Department of Transportation operating certificate issued to Boston–Maine.

Over ALPA's objections, Boston–Maine received permission from the DOT and the FAA to operate 727 aircraft in July 2004, and began doing so in August 2004. Prior to that time, Boston–Maine had flown passengers only on Jetstream 3100 turboprop planes, which seat nineteen as opposed to the 149 passengers who can be accommodated by one of the 727s. At the hearing before the magistrate, Pan Am pilots testified to an approximate twenty-five percent reduction in the number of hours that Pan Am offers them to fly each month since Boston–Maine started operating 727s, as

material to its analysis, they are discussed in that section as well.

**2.** All three of these men also hold the same position with respect to Guilford.

**3.** This effort included a June 1, 2004, memorandum on Pan Am letterhead encouraging its flight attendants to apply to Boston–Maine which stated, in part, "This is where the company (Guilford) is headed so give it serious consideration." Pl. Ex. 7, at 2.

well as to specific experiences suggesting that Pan Am was giving their work to Boston–Maine. According to the general counsel for all three defendants, Boston–Maine will operate the same service now performed by Pan Am after that entity's operations are discontinued.[4]

ALPA commenced this action on September 1, 2004, invoking this court's jurisdiction under the RLA. ALPA seeks, *inter alia*, an order enjoining the defendants "from utilizing Boston–Maine or any other alter ego operation to operate B–727s or other large jet aircraft for the purpose of transferring work and work opportunities of the Pan Am flight crewmembers" on the ground that to do so would interfere with the organization of Pan Am's pilots in violation of 45 U.S.C. § 152, Third and Fourth. Compl. at 16, 19. Asserting that this course of conduct would also violate the "status quo" provisions of the RLA codified at 45 U.S.C. § 152, First and Seventh, and 45 U.S.C. § 156, ALPA seeks to enjoin it "until all required bargaining, mediation and dispute resolution procedures of the RLA are exhausted." *Id.*

With its complaint, ALPA filed a "motion for temporary restraining order and preliminary injunction." The court referred this motion to the magistrate, who conducted an evidentiary hearing spanning September 9 and 10, 2004.[5] In his subsequent report and recommendation, issued September 17, 2004, the magistrate proposed that

upon the posting of adequate security by ALPA, that the defendants, Pan American Airlines, Inc., and their officers, agents, servants, employees, attorneys, and those persons acting in active concert or participation with them … be ordered to take the following acts:

1. Restore to the status quo rates of pay, rules and working conditions of the Pan Am flight crewmembers as they existed on July 15, 2004, including but not limited to, all those embodied in the [CBA], until all required bargaining, mediation and dispute resolution procedures of the RLA are exhausted.

2. Refrain from using Boston–Maine, or any other affiliated operation, to operate B–727s or any other large jet aircraft in service traditionally performed by Pan Am and that Pan Am is capable of performing.

3. Refrain from transferring to Boston–Maine any aircraft from the Pan Am certificate to the Boston–Maine certificate.

R & R at 288.

On September 20, 2004, the court granted ALPA's motion for a temporary restraining order, to the extent it required the parties to maintain the status quo existing the day the R & R issued, pending a

---

**4.** In light of this testimony, the court adopts the magistrate's characterization of the cessation of 727 operations at Pan Am, followed by the commencement of those operations on the same routes at Boston–Maine, as a "transfer," despite the defendants' apparent objection to that term. *See* Def. Obj. at 35 ("Here, there has been no 'transfer' of work. The unchallenged record is that Pan Am is unfortunately going out of business ….")

**5.** The defendants objected to the "consolidation" of ALPA's requests for a restraining order and preliminary injunction for determination through a single hearing on the grounds that it unfairly foreclosed any opportunity for discovery. The magistrate overruled the objection and denied the defendants' subsequent motion to continue the hearing "to conduct expedited discovery, particularly the depositions of [ALPA's] affiants to probe the foundation for their testimony and the averments contained in their affidavits." The defendants did not object to either of the magistrate's orders in this regard.

ruling on the parties' objections. Following a telephone conference with counsel on September 20, 2004, the court amended the order to enjoin the defendants from issuing a notice that Pan Am would be discontinuing its operations after October 31, 2004, also pending a ruling on the parties' objections. The court also directed the parties to file separate briefing on the issue of security for the recommended injunction. The defendants filed a timely objection to the R & R; both parties filed the requested briefing on the bond issue.

## Discussion

The defendants object to the report and recommendation on a number of grounds. First, they argue that the transfer of work from Pan Am to Boston–Maine presents only a minor dispute, over which the court lacks jurisdiction under the RLA, because it is permitted under an arguable reading of the CBA. Second, the defendants contend that the magistrate erred in determining that Boston–Maine is an alter ego of Pan Am such that the transfer of work from the latter to the former violates the status quo provisions of the RLA. Third, the defendants argue that the record fails to show what they call the "extremely limited circumstances" appropriate for judicial relief under 45 U.S.C. § 152, Third and Fourth. Fourth, the defendants challenge the magistrate's "conclusion that a *preliminary* injunction may issue under the RLA without the necessity of the plaintiff [*sic*] making the customary showing that it is entitled to equitable relief," *i.e.,* irreparable injury, a balance of harms in its favor, and the public interest on its side. Finally, the defendants make a series of objections to the "form" of the recommended order. The court will address these objections in turn, then consider the issue of security for the injunction.

## I. Whether the Transfer to Boston–Maine Poses a Major Dispute

■ As the First Circuit explained in *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry.,* 210 F.3d 18 (1st Cir.2000):

Under the RLA, a district court has no jurisdiction to rule on the merits of a labor dispute. Rather, the court may only decide what type of statutorily mandated dispute resolution procedure is appropriate, depending on the category of the dispute. Minor disputes under the RLA are those in which the carrier's challenged policies are at least arguably permitted under the existing collective bargaining agreement. If the dispute is "minor," the district court dismisses the case in favor of binding arbitration. Major disputes, on the other hand, relate to carrier attempts to modify rates of pay, rules or working conditions in a fashion not even arguably covered by the collective bargaining agreement. If the dispute is "major," the Act provides for extensive, non-binding mediation procedures. In major disputes—unlike minor disputes—the RLA bars the carrier from implementing the contested change until the mediation efforts are exhausted. To invest these status quo requirements with judicial authority, the district court is permitted to issue an injunction ordering the parties to maintain the pre-dispute status quo while the mediation procedures take place.

*Id.* at 23–24 (internal citations and footnotes omitted). The defendants object to the magistrate's determination that transfer of work from Pan Am to Boston–Maine presents a major dispute, authorizing the court to order the parties to maintain the status quo until completing the RLA-mandated mediation process, on the ground that the transfer is arguably permitted

under the CBA.[6]

In support of this objection, the defendants rely on the "scope clause" of the CBA, section 1.B, which provides:

1. Except as provided in subsection 1.B.2, all flying by and for the service of [Pan Am] on aircraft owned or leased by and for [Pan Am] and utilizing the authority granted under [Pan Am's] operating certificate shall be conducted ... by pilots whose names appear on the Pilots' System Seniority List ....

2. Notwithstanding subsection 1.B.1, above, [Pan Am] may enter into aircraft interchange agreements with other carriers if such interchange agreements do not result in the furlough of any of [Pan Am's] pilots.

Pl. Ex. 1, at 2–3. The defendants point out that an additional term proposed by ALPA, that Pan Am would "not create or acquire an alter ego to avoid the terms and conditions of the Agreement," Def. Ex. A, at 2, "was negotiated out" during the drafting of the CBA.[7] Tr. Inj. Hrg. at 42:2–6 (Sept. 10, 2004). Accordingly, the defendants argued to the magistrate that "ALPA's willingness to execute the CBA without its requested language makes it arguable that ALPA agreed that Pan Am could transfer its work to an affiliated non-union entity." R & R at 284 – 285. The magistrate rejected this claim as "obviously insubstantial." *Id.*

The court agrees with the magistrate's reasoning that the omission of ALPA's proposed term from the CBA provides absolutely no basis for reading the opposite term into the agreement. *See* R & R at 284. Indeed, a CBA which allows the employer to avoid all of its attendant obligations through the use of an alter ego is not a CBA at all, but merely the grant of a unilateral option to the employer to de-unionize its operations. *See Ruby v. TACA Int'l Airlines, S.A.*, 439 F.2d 1359, 1363 (5th Cir.1971) ("There is absolutely nothing about the [a]greement, or more fundamentally about the ... role of collective bargaining agreements in assuring industrial peace, which contemplates that during the term the employer has the right (unilaterally) to bring it all to an end ....") (internal quotation marks omitted; ellipses in original). The court therefore agrees with the magistrate that the defendants' reading is far too dubious to engender only a minor dispute.[8] *Cf. Sheet Metal Workers' Int'l v. Burlington N. R.R.*, 893 F.2d 199, 204 (8th Cir.1990) (where scope clause limited to work on locomotives

---

6. The defendants also argue that ALPA should be required to submit the issue giving rising to its request for a status quo injunction to arbitration. Def. Obj. at 37–39. Under the RLA, however, only minor disputes are subject to arbitration. *See Springfield Terminal*, 210 F.3d at 23–24. Although the defendants cite authority for the general proposition that "a district court must dismiss or stay proceedings ... when a valid arbitration agreement exists which covers the subject of a claim, they do not explain the interplay of that doctrine with the mechanism of the RLA, and the defendants fail otherwise to explain it." *Id.* Accordingly, the court considers the defendants' argument in this regard unpersuasive. *See also* R & R at 284 – 285.

7. In their objection, the defendants also rely on the fact that ALPA proposed a more expansive version of section 1.B.1 itself which did not end up in the final CBA. The defendants' witness on the negotiations giving rise to the CBA never mentioned this point in his testimony, and the magistrate does not appear to have considered it. The court therefore declines to take up the argument at this stage.

8. The court also concurs with the magistrate that the existence of Boston–Maine at the time the CBA was negotiated does not suggest that ALPA acquiesced in the diversion of its work for Pan Am to that entity, because "Boston–Maine did not operate 727 service similar to that offered by Pan Am when the CBA was negotiated." R & R at 283.

leased or purchased by employer, use of non-union labor on other locomotives despite contrary past practice presented only minor dispute).

■ In addition, the defendants do not appear to quibble with the magistrate's reliance on *Springfield Terminal* and cases from other circuits for the proposition that an employer's transfer of work to a non-union affiliate in and of itself triggers a major dispute under the RLA, provided the veil between employer and affiliate can be pierced. *Compare* R & R at 281–282 *with* Def. Obj. at 30–33. Instead, the defendants argue that none of these cases applies because the companies there "*first* sought to bargain with the union about whether it could 'divert' work to a non-union subsidiary or affiliate." Def. Obj. at 31. This argument advances a transparently strained reading of these cases to turn on the fact that "the court evidently viewed the company's prior attempt to bargain as an admission that [it] did not have the contractual right to subcontract the work" and that its subsequent position to the contrary could therefore not be "arguable" such that only a minor dispute arose. *Id.*

Although some of these cases cited the employer's efforts to obtain union approval of the change in question before seeking to implement it through a non-union affiliate as evidence that the transfer was intended to avoid union obligations, none of them so much as suggested that such evidence is essential to the conclusion. *See Springfield Terminal*, 210 F.3d at 29 (citing fact that "carrier only transferred work to the related corporation after unsuccessful union negotiations" as merely one non-dispositive factor in discerning whether "carrier used the related corporation for the purpose of evading the collective bargaining agreement and the status quo requirements of the RLA"); *Burlington N. R.R.*

*v. United Transp. Union*, 862 F.2d 1266, 1274 (7th Cir.1988) (noting that "Burlington's own conduct undermines its position" on the presence of a minor dispute *after* concluding dispute was major). Indeed, if the defendants were correct that the diversion of work to a non-union affiliate could never present a major dispute absent prior unsuccessful union negotiations on that point, it stands to reason that carriers would regularly seek to immunize themselves from pre-mediation injunctions by skipping the negotiations and going straight to the diversion. Such a result would be plainly inconsistent with the policy of the RLA "to prevent the union from striking and to prevent management from doing anything that would justify a strike" pending mediation. *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 150, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969).

Accordingly, the court adopts the R & R insofar as it determines that Pan Am's transfer of its 727 operations to Boston–Maine constitutes a major dispute within the meaning of the RLA, subject to the discussion *infra* of the defendants' objection to the magistrate's finding that Boston–Maine constitutes an alter ego of Pan Am.

II. *Whether Boston–Maine Is an Alter Ego of Pan Am*

■ The defendants claim that the R & R "errs in asserting that [Boston–Maine] is an 'alter ego' *simply because it is an affiliate*—in effect holding that the mere existence of a related company operating in the same market ipso facto establishes alter ego and a per se violation of the RLA." Def. Obj. at 4. Although the objection quotes at length from a case setting forth the standard for veil-piercing under the Federal Arbitration Act and from Judge Stahl's dissent in *Springfield Ter-*

*minal,* the defendants acknowledge that the majority opinion in *Springfield Terminal* supplies the applicable standard for determining the existence of an alter ego for purposes of the RLA. *Id.* at 34–35. In that case, the First Circuit advised that

> The corporate ties between the carrier and the related corporation provide only a starting point for the analysis. Common ownership is by itself insufficient to pierce the veil. The record must include evidence that the carrier used the related corporation for the purpose of evading the collective bargaining agreement and the status quo requirements of the RLA. In making this determination, no single factor is dispositive. The district court may consider the chronology of events: if the carrier only transferred work to the related corporation after unsuccessful union negotiations, that fact may suggest that the carrier shifted the work in an effort to avoid the RLA status quo provisions. That inference of evasion may be stronger when the work shifted to the related corporation is distinct from [its] primary line of business. Other factors may be relevant, such as whether the carrier and the related corporation fail to observe separate corporate formalities, or whether the related corporation is undercapitalized.
>
> We emphasize, however, that the record need not portray the related corporation as a "sham" business, expressly created or operated primarily to defeat the RLA .... It would make little sense to ignore current relationships and arrangements between corporations, and thereby grant the [carrier] immunity for veil piercing, in those cases where the related corporation being used to defeat the RLA was originally formed (or simultaneously used) for a legitimate purpose.

210 F.3d at 25–26 (internal citations omitted). The defendants argue that the evidence received by the magistrate establishes only the common ownership of Pan Am and Boston–Maine and none of the other factors deemed relevant by *Springfield Terminal.*

The court disagrees. The R & R specifically cites a number of facts supporting the magistrate's conclusion that Boston–Maine exists as an alter ego of Pan Am. Most significantly, the companies have the same president, chief operating officer, and general counsel, and Boston–Maine has regularly depended on Pan Am's human resources, whether to train Boston–Maine's own personnel or simply to come work for Boston–Maine outright. R & R at 283. These facts establish more than the common ownership of Pan Am and Boston–Maine—they establish their common management. Within the close confines of this relationship, the companies' owner intends to cease 727 operations at Pan Am and commence 727 operations at Boston–Maine to fly the same routes now serviced by Pan Am, even though Boston–Maine has flown only much smaller planes for nearly its entire existence. This record readily permits, if not compels, the conclusion that Pan Am plans to use Boston–Maine "for the purpose of evading the [CBA] and the status quo requirements of the RLA." *Springfield Terminal,* 210 F.3d at 25. The court therefore adopts the magistrate's finding that Boston–Maine is Pan Am's alter ego for purposes of the RLA.

III. *Whether the Transfer Is a Direct Attempt to Destroy a Union Warranting Relief Under 45 U.S.C. § 152, Third and Fourth*

■ The magistrate also accepted ALPA's alternative theory that the transfer of 727 operations to the non-union alter ego at Boston–Maine embodied a scheme

to eliminate ALPA's representation of Pan Am personnel and thereby destroy the union, warranting relief under 45 U.S.C. § 152, Third and Fourth.[9]  R & R at 285–286.  In support of this conclusion, the magistrate relied primarily on his findings that (1) the defendants intend for Boston–Maine to fly the same routes now serviced by Pan Am, but have no legitimate business purpose for this change, and (2) Fink expressed both a desire to "get rid" of ALPA and a plan for doing so.  *Id.* at 286.  The defendants complain that the magistrate improperly saddled them with the burden of proving a legitimate business purpose, Def. Obj. at 26 n. 17, and that he erroneously credited Toth's testimony about Fink's statements.  *Id.* at 41.

First, the court does not read the magistrate's statement that "the defendants cited no legitimate business purpose for starting a 727 operation at Boston–Maine," R & R at 286, as reflecting that he shifted any burden to the defendants.  In the court's view, the statement expresses the magistrate's conclusion that the evidence disclosed no apparent reason to transfer 727 service to an affiliate which had not traditionally performed it—and, like Pan Am, which had never turned a profit—other than to eliminate the unionized operation at Pan Am. As discussed in section II, *supra,* the record provides ample support for this finding.  The court therefore understands the challenged statement as an observation that the defendants had failed to rebut this conclusion convincingly with either argument or evidence—a failure which persists at this stage of the proceedings.

In any event, regardless of whether the magistrate erred in relying on the absence of a legitimate business purpose for the transfer, Fink's statements alone provide sufficient support for the proposition that it represented an attempt to destroy a union.  The defendants urge the court to reject Toth's testimony about those statements, calling her a "serial liar."  Def. Obj. at 20.  The magistrate, however, specifically found Toth to be a credible witness notwithstanding the defendants' attempts to impeach her.  R & R at 280 n. 4.

The Supreme Court has expressed skepticism over the rejection of a magistrate's recommended findings as to the credibility of a witness when those findings are dispositive, because "to do so without seeing and hearing the witness or witnesses whose credibility is in question could well give rise to serious questions . . . ." *United States v. Raddatz,* 447 U.S. 667, 681 n. 7, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *see also Cullen v. United States,* 194 F.3d 401, 407 (2d Cir.1999); *Hill v. Beyer,* 62 F.3d 474, 482 (3d Cir.1995).  Significantly, the defendants invite the court simply to reject the magistrate's finding that Toth was telling the truth *without* asking to have her testimony heard anew.  *Cf. United States v. Rosa,* 11 F.3d 315, 328–29 (2d Cir.1993) (noting that a district court having doubts about a magistrate's credibility findings should hear testimony from witness in question).  Having reviewed the record of both Toth's testimony and that of her former supervisor whom the defendants called to impeach her, the court finds no basis there for recalling either of those

9. Although the defendants remind the court in their objection that " 'the post-certification rights of unions under Section 2 Third and Fourth are narrowly circumscribed,' " Def. Obj. at 40 (quoting *Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists & Aerospace Work-ers,* 915 F.2d 43, 53 (1st Cir.1990)), they do not differ with the magistrate's conclusion that an employer's "direct attempt to destroy a union" violates those rights.  R & R at 286 (citing *Nat'l R.R.,* 915 F.2d at 51).

witnesses sua sponte. Instead, the court adopts the magistrate's finding that Toth gave a credible account of Fink's statements.

Accordingly, the court adopts the magistrate's determination that the transfer of 727 operations from Pan Am to Boston–Maine constituted a "direct attempt to destroy a union" such that the practice was enjoinable under 45 U.S.C. § 152, Third and Fourth. *Cf. Nat'l R.R.*, 915 F.2d at 52 (rejecting claim for relief under 45 U.S.C. § 152, Third and Fourth based solely on inferential evidence of anti-union animus).

## IV. *Whether ALPA Had to Satisfy Traditional Injunction Criteria*

■ The defendants "object to the [R & R's] conclusion that a *preliminary* injunction may issue under the RLA without the necessity of the plaintiff [*sic*] making the customary showing that it is entitled to equitable relief." Def. Obj. at 42. The magistrate determined that "under the RLA ... 'district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury.'" R & R at 286 (quoting *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 302, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989)). In their objection, the defendants rely on a First Circuit case decided before *Consol. Rail* which they characterize as construing the term "labor dispute" in the Norris–LaGuardia Act, 29 U.S.C. §§ 101–115 to encompass the term "labor dispute" in the RLA. Def. Obj. at 42 (citing *Int'l Association of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir.1987)). According to the defendants, this holding compels the conclusion that 29 U.S.C. § 107, which requires a court to identify the presence of the traditional equitable criteria before issuing "an injunction in any case involving or growing out of a labor dispute, as defined in this chapter," applies.

The magistrate rejected this argument as an "invitation to rule that the Supreme Court was wrong" in *Consol. Rail.* R & R at 286. The defendants' objection fails to explain the error in this analysis, relegating their attempt to distinguish *Consol. Rail* to a six-line footnote.[10] Def. Obj. at 43 n. 23. This court requires a considerably more convincing argument to persuade it not to follow Supreme Court precedent.

Although he rejected the defendants' argument as to the applicability of 29 U.S.C. § 107 to this case, the magistrate nevertheless went on to consider whether ALPA had shown irreparable harm, a balance of harms in its favor, and the public interest on its side. R & R at 287–288. He concluded that ALPA had succeeded in making these showings, *id.*, and the defendants challenge this conclusion in their objection. Def. Obj. at 42–46. The court has considered the defendants' arguments in this regard but considers them unpersuasive for essentially the same reasons

10. The footnote cites a later First Circuit opinion in the *E. Airlines* case, issued subsequent to the Supreme Court's decision in *Consol. Rail*, for the proposition that the circuit continues to condition the issuance of a status quo injunction under the RLA upon a finding of the equitable criteria set forth at 29 U.S.C. § 107. Def. Obj. at 43 n. 23 (citing 925 F.2d 6 (1st Cir.1991)). This opinion, however, deals with the applicability of the bond requirement of the Norris–LaGuardia Act, rather than the criteria of 29 U.S.C. §§ 107(b)-(d), and nowhere discusses *Consol. Rail.* 925 F.2d at 9. Furthermore, the opinion explains the First Circuit's earlier holding in the case as "a controversy under the [RLA] *can* also be a labor dispute under the Norris–LaGuardia Act," rather than equating the two concepts, as the defendants would have it. *Id.* (emphasis added). Thus, the second *E. Airlines* opinion actually undermines the defendants' argument.

set forth in the R & R. Accordingly, the court adopts the R & R to the extent it determines that ALPA need not satisfy traditional equitable criteria to secure an injunction under the RLA but that, even if ALPA must make such a showing, it has.

## V. Objections to the "Form" of the Proposed Injunction

Finally, the defendants object to the injunction as recommended by the magistrate

(1) because it is phrased as permanent relief, not as a temporary injunction; (2) because it restricts ... Guilford, against whom no evidence was introduced except minimal overlapping management; (3) because it fails to make clear that Pan Am may continue with its announced orderly cessation of business; and (4) because it is not sufficiently specific as to what action [Boston–Maine] may and may not take.

Def. Obj. at 47. In its response, ALPA acknowledges that the recommended injunction "may be somewhat confusing or imprecise" as to the restraints it imposes on Boston–Maine. Pl. Resp. Def. Obj. at 37. ALPA also expresses its view that under the proposed order, "defendants would remain free (subject to potential damages claims and whatever other legal restrictions this [c]ourt would apply to such a shutdown decision) to discontinue Pan Am's operations altogether," provided they do not "replace Pan Am's large-jet operations with identical operations by Boston–Maine." Pl. Resp. Def. Supp. Mem. at 4–5 (footnote omitted).

The defendants' objection fails to explain in what way the proposed order is not "sufficiently specific" as to the future operations of Boston–Maine. Although ALPA proposes alternative language in its response, the court believes that the proposal actually broadens the restrictions on Boston–Maine beyond those necessary to maintain the status quo. Preventing Boston–Maine from operating any "B–727s or other large jet aircraft" does not necessarily reflect the state of things prior to the onset of the present dispute. The court therefore adopts the proposed injunction in the language used by the magistrate.

The court also agrees with ALPA's understanding that nothing in the proposed order prevents the defendants from ceasing operations at Pan Am per se. Instead, the recommended injunction requires the defendants to "[r]estore to the status quo the rates of pay, rules and working conditions of the Pan Am flight crewmembers as they existed on July 15, 2004, including but not limited to, all those embodied in the [CBA]" pending the outcome of the RLA procedures and prevents the transfer of certain Pan Am operations to Boston–Maine or another affiliate. R & R at 288. Without knowing the parameters of Pan Am's intended "cessation of business," this court cannot determine whether any aspect of it would offend the CBA or otherwise violate the status quo or, if so, whether a minor or major dispute would result. Accordingly, the court declines to entertain the defendants' general objection to the form of the order on the ground that it prevents Pan Am from shutting down its operations, without prejudice to either side to seek a modification of the injunction or other relief depending on what the future holds.

■ In this court's view, the defendants' first objection to the "form" of the order misapprehends the nature of a proceeding brought under the RLA. The only relief the court may grant is "to issue an injunction ordering the parties to maintain the pre-dispute status quo while the mediation procedures take place." *Springfield Terminal,* 210 F.3d at 24. The court "has no jurisdiction to rule on the merits of [the]

labor dispute." *Id.* at 23. In a proceeding brought to enforce the status quo provisions of the RLA, then, the traditional distinction between preliminary and permanent injunctive relief would not seem to apply. Indeed, once the court identifies the presence of a major dispute warranting a status quo injunction, there remains nothing left for the court to decide.

Nevertheless, this court ·acknowledges that the term "preliminary injunction" is often used to describe a court's order to maintain the status quo issued pursuant to the RLA. More significantly, ALPA styled its request for relief in this case as a "motion for temporary restraining order and preliminary injunction." Under these circumstances, the defendants might have believed that any resulting order would require them to maintain the status quo on only a temporary basis until the court could have a full-fledged hearing on ALPA's claims.

Yet in this case, the magistrate has already conducted an evidentiary hearing where each side was permitted to call its own witnesses and cross-examine the other's, introduce documentary evidence, and present arguments. The defendants' objection does not make clear what they believe remains to be done before the recommended injunction becomes "permanent," *i.e.*, does not await the completion of any further proceedings in this court. Although the defendants sought pre-hearing discovery before the magistrate, he refused to grant it, and the defendants never appealed those rulings to this court.

Against this procedural background, the court considers it appropriate to permit the defendants to show cause why proceedings in this court should continue following the adoption of the R & R. The defendants shall file a brief to that end by October 18, 2004, if they wish to pursue the issue. ALPA shall file its response, if any, by October 21, 2004. In the meantime, the injunction will issue as recommended.·

Finally, the court considers Guilford's objection to being subject to the injunction to be without merit. The magistrate's findings, as adopted by this court, make clear that it was Guilford who was orchestrating the diversion of work from Pan Am to Boston–Maine. R & R at 283 – 284. Therefore, to have its appropriate effect, the order must extend to Guilford. *See Springfield Terminal,* 210 F.3d at 30.

VI. *The Appropriate Amount of the Bond for the Injunction*

The magistrate recommended that his proposed injunction issue "upon the posting of appropriate security by ALPA." R & R at 288. ALPA does not object to this requirement in the first instance, but only to the defendants' suggestion that "the only adequate undertaking to secure ongoing operations [at Pan Am] will be an open ended, no-interest, non-recourse credit line from a reputable financial institution ·to be arranged by ALPA" to cover all of Pan Am's projected losses "pending a full hearing on the merits." Def. Supp. Mem. at 10–11. To the contrary, ALPA contends that the amount of the bond should not exceed $50,000.

Section 7 of the Norris–Laguardia Act, which ALPA concedes is applicable to the magistrate's recommended order, states that

no temporary restraining order or temporary injunction shall be issued except on condition that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together

with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.

29 U.S.C. § 107. The defendants contend that their "loss, expense, or damage" caused by the recommended injunction includes Pan Am's operating losses going forward, as well as the costs of indemnifying their customers for any losses in rebooking flights scheduled on Pan Am with other carriers.

As discussed *supra*, however, the proposed injunction does not by its terms require Pan Am to remain in business. It simply (1) requires Pan Am to restore the rates of pay, rules, and working conditions with regard to its flight crewmembers, including those required by the CBA, as they existed prior to July 15, 2004, and (2) prevents Pan Am from transferring certain of its operations to Boston–Maine or another affiliate. Rather than explaining how restoring the status quo in this way would itself injure Pan Am, the defendants have pressed the seemingly irrelevant argument that staying in business would injure Pan Am. The defendants have also failed to explain how their inability to shift Pan Am's 727 operations to Boston–Maine would lead to the losses they describe, because it is unclear that Boston–Maine

would lose any less money on those flights than Pan Am would.[11]

Accordingly, the court will not require ALPA to post security for any of the costs described in sections I or II of the defendants' supplemental memorandum. *See Div. I, Detroit*, 844 F.2d at 1226–29 (vacating $750,000 bond for RLA injunction without "specific evidence supporting [carrier's] claim that the status quo injunction placed [it] in immediate financial peril"); *Bhd. of Maintenance of Way Employees, Lodge 16 v. Burlington N. R.R.*, 642 F.Supp. 41, 49 (N.D.Iowa 1985) (refusing to require bond for RLA injunction where "harm which may be sustained by the defendant should the grant of preliminary injunction be ultimately found improper ... is contingent on the happening of events other than those directly affected by the injunction"), *rev'd in part on other grounds*, 802 F.2d 1016 (8th Cir.1986).

"Section 7 of the Norris–LaGuardia Act clearly expresses the congressional intent to require that preliminary injunction undertakings in labor disputes include a provision for reasonable attorneys' fees." *E. Airlines*, 925 F.2d at 9. Again, ALPA concedes that section 7 applies here. Nevertheless, ALPA challenges the defendants' assertion that the bond should include their "approximately $148,000" in legal expenses to date in opposing ALPA's request for an injunction, which assertedly

---

**11.** The defendants claim that DOT regulations will require Pan Am "to pay some or all of its customers the fare differential between what they are charged upon rebooking [a scheduled Pan Am flight with another carrier] and the cost of their Pan Am ticket" once Pan Am shuts down its operations because it has not been able to notify customers of that eventuality. Def. Supp. Mem. at 3–4. As an initial matter, the defendants do not cite to the regulations in question, and the plain language of the DOT rule referenced (without further authority) in their previous submission on this point does not readily support their position.

Furthermore, the defendants' estimate of their anticipated "indemnification" costs is highly speculative, based solely on their general counsel's multiplying the number of passengers booked to fly Pan Am in November, 2004, by one hundred dollars. The court will not require ALPA to post security for expenses that Pan Am has not convincingly shown will occur, either at all or anywhere near the estimated amount. *See Div. No. 1, Detroit, Bhd. of Locomotive Eng'rs v. Consolidated Rail Corp.*, 844 F.2d 1218, 1226–29 (6th Cir. 1988).

"will more than double" when they act on their stated intention to appeal this order to the First Circuit on an expedited basis. Def. Supp. Mem. at 5. ALPA argues that 29 U.S.C. § 107 requires that the bond include "a reasonable attorneys' fee" but that the defendants have failed to adduce any evidence that $148,000 represents a reasonable figure.

The court agrees. The only evidence the defendants have submitted in support of the $148,000 figure is their general counsel's statement to that effect in his declaration.[12] The declaration, however, provides no itemization whatsoever and, indeed, does not even report the hourly rate the defendants paid in connection with this matter or the number of hours expended. Furthermore, the declaration does not furnish any estimate as to the fees likely for any appeal; the "more than double" figure appears only as a representation in the brief itself. Finally, the general counsel does not offer any opinion (of his own or anyone else's) that the $148,000 sum is reasonable in terms of the complexity of work or the quality of representation.[13]

On this record, the court cannot conclude that $148,000 represents the defendants' "reasonable attorney's fee" for this matter within the meaning of 29 U.S.C. § 107. ALPA proposes that "[g]iven the dearth of evidence" as to the defendants' actual damages in the event the injunction is erroneous, "the amount of the undertaking in this case, at least initially, should not exceed $50,000." Pl. Resp. Def. Supp.

Mem. at 8. The court agrees with this approach. *Cf. E. Airlines,* 925 F.2d at 8–10 (affirming bond requirement including defendant's attorneys' fee on appeal by plaintiff where it had stipulated to minimum amount of fee). Moreover, in setting the amount of a bond for an injunction under the RLA, "the court should be sensitive not only to the enjoined party's need for security against financial loss, but also to the moving party's right to relief and the Act's goal of preventing unilateral actions in major disputes." *Div. 1, Detroit,* 844 F.2d at 1226–27; *accord E. Airlines,* 925 F.2d at 9 (noting that in RLA case, "a district court retains substantial discretion to dictate the terms of an injunction bond"). Requiring ALPA to secure an open-ended, interest-free, non-recourse line of credit on Pan Am's behalf, as the defendants suggest, would show little sensitivity to ALPA's right to pursue relief in this case.

The court concludes that ALPA's proposed $50,000 bond appropriately strikes the balance between the defendants' need for security should the injunction prove improper and ALPA's right to seek relief from the planned shift of work from Pan Am to Boston–Maine. Accordingly, ALPA shall forthwith submit to the court the $50,000 letter of credit referenced in its October 8, 2004, filing as security for the injunction hereby issued.

### Conclusion

For the foregoing reasons, the court hereby adopts the magistrate's report and

---

**12.** Although the declaration was filed under seal, the defendants cite to this portion of it in the unsealed version of their supplemental memorandum filed with the court as a courtesy.

**13.** Although the defendants purport to hold back on "evidence going directly to the amount of the bond" in their supplemental

memorandum, they purport to do so on the theory that "until the terms of the order are known [they] cannot fairly estimate the impact on their business operations." Def. Supp. Mem. at 2 n. 1. They do not claim to suffer from any similar uncertainty with regard to attorneys' fees, particularly those that have already been incurred.

recommendation issued in this matter on September 17, 2004, in its entirety, including the terms of the proposed injunction. For purposes of convenience and clarity, the court issues a separate "Injunction Order" herewith setting forth those same terms. The defendants shall show cause by October 18, 2004, why there should be any further proceedings on this matter in this court. ALPA shall file any response thereto by October 21, 2004. ALPA shall immediately file with the court registry the $50,000 letter of credit referenced in its October 8, 2004, notice. Upon receipt of the letter of credit, the temporary restraining order issued pending the court's decision on the R & R (document no. 36) and the subsequent order of amendment (document no. 44) shall be dissolved and the injunction shall become effective forthwith without further court action.

SO ORDERED.

## REPORT AND RECOMMENDATION

MUIRHEAD, United States Magistrate Judge.

Before the Court for consideration is the motion filed by Air Line Pilots Association, International ("ALPA") for a preliminary injunction under the Railway Labor Act ("RLA"), codified at 45 U.S.C. § 151 et seq., to restrain defendants Guilford Transportation Industries, Inc. ("Guilford"), Pan American Airways Corp. ("Pan Am") and Boston–Maine Airways Corp. ("Boston–Maine") (collectively "the Guilford defendants") from violating the statutory rights of Pan Am's flight crewmembers ("pilots") and their union, ALPA, under 45 U.S.C. § 152 First, Second, Third, Fourth, Seventh and Eighth and 45 U.S.C. § 156. The defendants filed an objection.

This matter was referred to me to review the request for injunctive relief, to conduct any hearing the Court might set, and to file proposed findings and recommendations. The Court held an evidentiary hearing on September 9 and 10, 2004. For the reasons set forth below, the Court recommends that the request for a preliminary injunction be granted.

### Standard of Review

"The policy of the Railway Labor Act was to encourage use of the nonjudicial processes of negotiation, mediation and arbitration for the adjustment of labor disputes." *Bhd. of R.R. Trainmen, Enter. Lodge, No. 27 v. Toledo, P. & W. R.R.*, 321 U.S. 50, 58, 64 S.Ct. 413, 88 L.Ed. 534 (1944). Federal district courts do not have jurisdiction to rule on the merits of labor disputes under the RLA. *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry.* (*"Springfield Terminal"*), 210 F.3d 18, 23 (1st Cir.2000). The court only decides what type of dispute resolution procedure applies based on the category into which the dispute fits. *Id.* (citing *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 722–23, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945)).

A threshold issue that must be determined is whether a controversy should be characterized as a "minor" or "major" dispute. *Consolid. Rail Corp. v. Ry. Labor Executives' Ass'n* (*"Conrail"*), 491 U.S. 299, 302, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989). In sum, "major disputes seek to create contractual rights, minor disputes to enforce them." *Id.* (citing *Elgin*, 325 U.S. at 723, 65 S.Ct. 1282).

The RLA bars a carrier from implementing a contested change in a major dispute until mediation efforts are exhausted. *Springfield Terminal*, 210 F.3d at 24 (citing *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union* (*"Shore Line"*), 396 U.S. 142, 150–53, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969)). However, if the employer claims that the parties' agree-

ment gives it the right to make a contested change, "and if the claim is arguably justified by the terms of the parties' agreement (i.e., the claim is neither obviously insubstantial or frivolous, nor made in bad faith)," the employer may make the change and the courts must defer to the jurisdiction of arbitrators to decide the dispute. *Conrail*, 491 U.S. at 310, 109 S.Ct. 2477; *see also, Springfield Terminal*, 210 F.3d at 33 (to show that only a minor dispute is at issue, a carrier need only show that its contractual term defense is not "totally implausible"). In considering whether the carrier's actions are arguably justified by the agreement, the court considers express and implied terms, as well as the parties' "practice, usage and custom." *Conrail*, 491 U.S. at 311, 109 S.Ct. 2477 (quoting *Transp.—Communication Emp. Union v. Union Pac. R. Co.*, 385 U.S. 157, 161, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966)).

If the circumstances so warrant, a court may issue an injunction ordering the parties to maintain the pre-dispute status quo during the dispute resolution procedures mandated under the RLA. *Springfield Terminal*, 210 F.3d at 33 (citing *Conrail*, 491 U.S. at 303, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989)).

*Background*

## I. *Stipulated Facts*

Pan Am entered into a collective bargaining agreement ("CBA") with ALPA that became effective on November 15, 1999, remains in effect now, and does not become amendable until November 15, 2005. Neither party gave the other notice of a desire to amend the CBA prior to the amendable date.

Neither Guilford, nor Boston–Maine are parties to the ALPA–Pan Am CBA, and have entered into no agreement with ALPA. The pilots of Boston–Maine are not represented for the purposes of collective bargaining by an exclusive bargaining agent.

Pan Am performs regular, scheduled passenger service in the eastern United States and Puerto Rico and operates charters, with a fleet of six Boeing 727 aircraft configured to seat 149 passengers. Since it received certification from the Department of Transportation ("DOT") in 1999, Pan Am has had authority to operate up ⁺o eight 727 aircraft. Pan Am currently employs approximately 30 pilots. Twenty-one Pan Am pilots are active ALPA members.[1]

Boston–Maine applied to the DOT for authority to fly 727 aircraft for interstate, scheduled passenger service on August 27, 2002. ALPA has been aware of Boston–Maine's planned 727 operations since that date and has vigorously opposed DOT certification of Boston–Maine's planned 727 operation.

After requesting and receiving oral permission on July 16, 2004 from the DOT, and operational permission from the Federal Aviation Administration ("FAA"), to operate 727 aircraft, Boston–Maine began to operate 727 aircraft in August 2004 in interstate service, despite ALPA's vigorous opposition.

Prior to receiving authorization by the DOT to fly 727 aircraft in July 2004, Boston–Maine performed scheduled passenger

---

**1.** Matthew J. Kernan, a commercial airline pilot employed as a Captain with Piedmont Airlines, and ALPA's Resource Coordinator, testified that he has been appointed as the Custodian Representative for the Pan Am pilot group. Kernan testified that in his capacity as Custodian Representative he administers grievances under the Pan Am–ALPA CBA. Kernan also testified that ALPA has been unable to get any Pan Am crewmembers to take on ALPA leadership positions because they fear reprisals by Pan Am.

service with a fleet of ten Jetstream 3100 turboprop aircraft, seating 19 passengers, among other aircraft, and cargo service utilizing two CASA–212 turboprop aircraft. Boston–Maine still operates both the Jetstream and CASA aircraft. Boston–Maine is currently hiring and training 727 pilots.

Guilford is the lessor of the six B–727 aircraft operated by Pan Am and the single B–727 aircraft operated by Boston–Maine.

## II. *Additional Facts*

Pan American Airlines, Inc. ("Pan Am Inc."), not named as a defendant in this lawsuit, is the owner of Pan Am and Boston–Maine. Pan Am Inc. acquired the assets of Pan Am (formerly known as Carnival Airlines) out of bankruptcy in June 1998 under a Plan of Reorganization approved by the United States Bankruptcy Court for the Southern District of Florida. Boston–Maine, a New Hampshire corporation, was formed as a wholly-owned subsidiary of Pan Am Inc. in March 1999. Neither party has produced evidence identifying the ownership of Pan Am Inc.

John Nadolny, defendants' principal witness, testified that Guilford has no ownership interest in either Pan Am or Boston–Maine.[2] Nadolny further testified that Guilford does not direct the operations of those companies.[3]

Nadolny testified that Pan Am has lost money ever since it resumed operating out of bankruptcy. The evidence showed that

Pan Am once ceased operating for just under 30 days. While Pan Am formerly employed as many as 90 pilots, following a furlough in the fall of 2002 the Pan Am pilot ranks were reduced to 30. Nadolny testified that Pan Am notified the FAA in June 2004 that it intended to cease operations no later than October 31, 2004.

Nadolny testified that the Boston–Maine operation was started from scratch. He testified that Boston–Maine employs personnel separate from Pan Am in the titles of Director of Operations, Director of Maintenance, Director of Quality Assurance, Director of Safety, and Chief Pilot. He testified that, pursuant to law, Boston–Maine has received a certificate for each aircraft it operates and that Boston–Maine pilots do not fly Pan Am certified aircraft in revenue-producing airline service. He further testified that Boston–Maine's operating specifications, procedures and manual are distinct from those of Pan Am. In addition, Boston–Maine operates its own flight dispatching and tracking facilities, maintenance facilities, inventory storage facilities, quality assurance programs, training programs, record keeping, financial accounts, vendor accounts, U.S. Customs bonds, and contractual arrangements.

Like Pan Am, Boston–Maine has never been profitable. However, the evidence shows that Boston–Maine's operations have expanded while Pan Am's have contracted. In documents that Boston–Maine submitted to the DOT requesting amended certificates of authority, Boston–Maine

---

**2.** The parties stipulated that John Nadolny is the General Counsel for Guilford, Pan Am and Boston–Maine.

**3.** ALPA alleges that there is a close interrelationship between Pan Am, Boston–Maine and Guilford. *See* Mem. of Points and Authorities In Support of Pl.'s Mot. at 5 and n. 1. As support for this assertion, ALPA relied in large part upon the Declaration of Robert E. Barnes, a former Pan Am Vice President who

is now employed by the FAA. Citing health problems on the morning of September 9, 2004, Barnes did not appear to testify. The Court granted ALPA leave to take Barnes' deposition, and to submit the transcript as evidence, but ALPA declined. The Court does not consider Barnes' declaration as evidence supporting ALPA's request for injunctive relief.

identified a number of former Pan Am employees who now work for Boston–Maine, including some who have assumed management positions at Boston–Maine. *See* Fawbush Decl., Exs. 4, 10 and 11.

The evidence shows that Pan Am and Boston–Maine entered into a support services and facilities agreement in October 2001, and that Boston–Maine uses Pan Am personnel to train its employees. Among the Pan Am employees who have trained Boston–Maine employees is Linda Toth, formerly employed by Pan Am as Southern Regional Manager. Toth testified that she conducted stations training.[4]

Toth testified that during the course of her employment with Pan Am she spoke with David Fink frequently.[5] Toth testified that Fink talked about ALPA all the time, and that he greatly disliked the organization. Toth testified that in March or April 2004 Fink told her, among other things, that "it was going to be smooth sailing with Boston–Maine" after they got rid of "the union jackasses," and that within six months all of the planes would be on the Boston–Maine certificate.

ALPA introduced a memorandum on Pan Am stationary to Pan Am flight attendants dated June 1, 2004 encouraging them to send their resumes to Boston–Maine. Pl. Ex. 7. That memorandum states in relevant part:

> If you have an interest in applying for a Flight Attendant position with Boston–Maine Airways, now is the time to get your resume tuned up .... If you have been doing a very good job at Pan Am then Boston–Maine Airways is interested in considering you for this new airline. It's a different company so you will be starting over, so to speak. This is where the company (Guilford) is headed so give it serious consideration.

*Id.* at 2.

Pan Am Captain Norman Schott and First Officer Kevin Black both testified that the amount of hours that they have been offered to fly each month has been reduced from approximately 80 hours per month to approximately 50 to 60 hours per month since Boston–Maine started its 727 operation. Schott testified to a specific instance when he lost scheduled passenger flying assignments to Boston–Maine. Schott testified that he checked in with Pan Am's crews scheduling department for flying that he was to do on August 5, 2004 and was told that the last two legs of the assignment he was supposed to have flown would be done instead by Boston–Maine. Schott further testified that when he telephoned the scheduling department to inquire about a revision to the September

4. Linda Toth's employment was terminated in June 2004. Toth testified that she was ordered by Stacy Beck, Director of Stations for Pan Am and Boston–Maine, to certify that certain Boston–Maine employees had received ramp training that Toth testified she was not certified to provide. Toth testified that she was subsequently terminated for falsifying documents.

Stacy Beck testified that Toth was certified to provide Boston–Maine ramp training and that Toth lied about having conducted the training and falsified documents. Beck testified that she did not order Toth to falsify documents, and that she terminated Toth's employment after conducting an audit that revealed that the training in question had not been completed.

Having listened to the testimony of the witnesses, and reviewed the exhibits, the Court finds Toth's testimony that she did not believe that she was certified to perform Boston–Maine ramp training, and that she was ordered to sign documents indicating that she had performed the training, to be credible.

5. The parties stipulated that David Fink is the President of Guilford, Pan Am and Boston–Maine.

bid package [6] that reduced the amount of flying he could perform from about 80 hours per month to between 50 and 60 hours he was told that marketing made a last minute decision to give the Santa Domingo line to Boston–Maine. Schott further testified that he discovered a pop-up advertisement displayed on Pan Am's website offering first class and coach seats for flights between San Juan and Santo Domingo. See Pl.'s Ex. 4. Schott concluded that this work was going to be given to Boston–Maine because Pan Am does not operate any 727 aircraft configured for first class service, but Boston–Maine does.[7]

The evidence shows that Pan Am and Boston–Maine operate a joint reservation system that may be accessed from either the Pan Am or Boston–Maine websites. In addition, a route map on the Boston–Maine website shows both Pan Am and Boston–Maine service. Nadolny testified that Boston–Maine intends to operate the same service that is currently being offered by Pan Am after Pan Am's operations are discontinued.

### Discussion

ALPA argues that injunctive relief is warranted because the defendants are engaged in an alter-ego work diversion scheme that will result in the complete and final shutdown of Pan Am and the discard of ALPA. ALPA argues that the defendants intend to permanently replace Pan Am's operations, which are unionized, with the non-union Boston–Maine operation controlled by the defendants.

Defendants dispute ALPA's claim that Pan Am has been engaged in unlawful work diversion. Defendants argue that

Pan Am has on occasion subcontracted work to other airlines, including Boston–Maine, in accordance with the CBA, but that this was only in instances where there have been maintenance or crew shortage problems that arose on a particular day. Defendants contend that the issues presented in this action pertain to a "minor" dispute within the meaning of the RLA because it involves an interpretation of the scope of work provisions of the CBA. Therefore, defendants argue, this dispute is subject to arbitration under the RLA, and the federal courts lack jurisdiction to hear the parties' dispute.

### I. Whether the Controversy at Issue is a Major Dispute

#### A. Status Quo Provisions of the RLA

The RLA provides that:

It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152 First. The RLA further provides that:

No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

---

6. The bid package is the means through which Pan Am pilots express their preference for work assignments.

7. The Court does not find credible Nadolny's testimony that the pop-up ad reflected in Plaintiff's Exhibit 4 was just an experiment by the IT department that only appeared on Pan Am's website one day.

45 U.S.C. § 152 Seventh. Section 6 of the RLA requires that employers and employee representatives "shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules or working conditions . . . ." 45 U.S.C. § 156. RLA Section 2, First and Seventh, and Section 6, the so-called "status quo" provisions, prohibit unilateral changes in wages or working conditions where there is a preexisting collective bargaining agreement. *Atlas Air, Inc. v. Air Line Pilots Ass'n,* 232 F.3d 218, 223 (D.C.Cir.2000).

### B. *Work Diversion Claim*

Federal courts, including the First Circuit, have held that "[t]he RLA is defeated if a carrier uses a related corporation to alter the status quo." *Springfield Terminal,* 210 F.3d at 28. Indeed, the First Circuit found that "[t]he mere 'prospect of having work shifted to a replacement subsidiary would constitute a change in the working conditions and practices' sufficient to trigger a major dispute." *Id.* at 33 (quoting *Air Line Pilots Ass'n, Int'l v. Transamerica Airlines, Inc. ("Transamerica Airlines ")*, 817 F.2d 510, 516 (9th Cir.1987)). *See also Burlington N. R.R. Co. v. United Transp. Union,* 862 F.2d 1266, 1275 (7th Cir.1988) (a carrier cannot evade its duties under a collective bargaining agreement or the RLA by directing business to an entity within the same corporate family and not obligated by the existing collective bargaining agreement); *Transamerica Airlines,* 817 F.2d at 515 (federal courts have jurisdiction to hear a dispute in which an employer is alleged to have established a non-union replacement subsidiary in order to transfer to that non-union subsidiary work being performed by an existing·subsidiary that is bound by a collective bargaining agreement).

In determining whether a carrier is using a related corporation to alter the status quo, a court must look beyond corporate formalities if the nominally independent corporation is serving as the alter ego of the carrier. *Springfield Terminal,* 210 F.3d at 28. Veil piercing under the RLA may apply to separate corporations within the same corporate family and is not limited to wholly-owned subsidiaries of the carrier. *Id.* at 29.

The mere existence of common ownership, by itself, is insufficient to pierce the corporate veil. *Id.*

> The record must include evidence that the carrier used the related corporation for the purpose of evading the collective bargaining agreement and the status quo requirements of the RLA. In making this determination, no single factor is dispositive. The district court may consider the chronology of events: if the carrier only transferred work to the related corporation after unsuccessful union negotiations, that fact may suggest that the carrier shifted the work in an effort to avoid the RLA status quo provisions.

*Id.* (citations omitted). The First Circuit emphasized that a plaintiff is not required to show that the related corporation is a sham business or that it was created or operated primarily to defeat the RLA in order to demonstrate that the corporate veil should be pierced. *Id.* at 30. That is because the function of veil piercing in the RLA context is not to determine liability as in tort or contract cases. *Id.* Rather, "in the RLA major dispute proceedings, veil piercing operates only to block the related corporation from assisting the carrier in altering the collective bargaining agreement before mediation procedures are exhausted." *Id.* In this regard, "RLA veil piercing is similar to the well-established practice of extending the scope of an injunction to include non-parties acting in

concert with parties to defeat the injunction's purpose." *Id.*

In the instant case, ALPA argues that the defendants have engaged in a work diversion scheme taking existing Pan Am work and diverting it to non-union Boston–Maine, which defendants created and control. The result, according to ALPA, has been a decrease in the amount of flying performed by Pan Am and its unionized employees.

The evidence supports a finding that the defendants have used Boston–Maine to circumvent the collective bargaining agreement. Pan Am and Boston–Maine are part of the same corporate family. The aircraft flown by both companies are leased by Guilford. Defendants have stipulated that at least three senior corporate officers of Pan Am, Boston–Maine and Guilford are the same.[8] In addition, Stacy Beck testified that she is the Director of Stations for both Pan Am and Boston–Maine.

The evidence shows that the Boston–Maine operation was built from scratch when Pan Am already had a certified 727 airline with trained and experienced 727 pilots. The defendants have not cited any legitimate business purpose for starting a duplicate 727 operation at Pan Am's non-union affiliate, Boston–Maine, following losses and a major furlough at Pan Am.

The evidence further shows that in the course of expanding the non-union Boston–Maine operation, Boston–Maine has taken on a number of former Pan Am employees including some who have taken on management positions. The evidence further shows that Pan Am employees have been used to train Boston–Maine employees while the defendants planned to shut down Pan Am.

The Court credits Linda Toth's testimony that David Fink, President of Guilford, Pan Am and Boston–Maine, told her in March or April 2004 that "it was going to be smooth sailing with Boston–Maine" after they got rid of "the union jackasses," and that within six months all of the planes would be on the Boston–Maine certificate. Although it is not necessary to the Court's result, these comments support ALPA's claim that the defendants have planned to transfer Pan Am's work to an affiliated non-union operation that they control. The June 2004 Pan Am memorandum to its flight attendants encouraging them to apply to Boston–Maine because that is where Guilford is headed further supports the conclusion that the defendants are acting in concert to divert work traditionally performed by unionized Pan Am to non-union Boston–Maine.

The defendants argue that Boston–Maine has existed in parallel with Pan Am throughout the duration of the CBA, and that the CBA does not preclude Pan Am from subcontracting work to an affiliated airline. However, this argument overlooks that Boston–Maine did not operate 727 service similar to that offered by Pan Am when the CBA was negotiated. As ALPA argues, Boston–Maine's small aircraft operation could be viewed as merely complementary to Pan Am's 727 service.

The Court is unpersuaded by the defendants' argument that ALPA is using this lawsuit in an attempt to obtain rights that it bargained away. The evidence at the hearing showed that prior to the execution of the CBA, ALPA proposed that the Recognition and Scope Section expressly provide that "[Pan Am] will not create or acquire an 'alter ego' to avoid the terms and conditions of the Agreement." *See*

---

**8.** In addition to the multiple positions held by Fink and Nadolny, the parties stipulated that

Eric Lawler is the Chief Financial Officer for Guilford, Pan Am and Boston–Maine.

Defs.' Ex. A, Sec. 1, Para. B, No. 5. Pan Am rejected that suggestion and the executed CBA does not contain that language.[9] Defendants argue that ALPA's work diversion claim requires an examination of the parties' bargaining history and an interpretation of the Scope of Work provision of the CBA, which defendants contend requires that this dispute be resolved in arbitration.

ALPA argues that the cited language from its draft of the CBA merely sought the addition of an added layer of protection. ALPA analogizes this to collective bargaining agreements that include language stating the employer will not engage in unlawful discriminatory practices notwithstanding that employees have constitutional and statutory protection against unlawful discrimination. ALPA argues that it did not give up its statutory rights to protection from attempts to divert work to a non-unionized affiliated entity within Pan Am's corporate family.

The Court agrees with ALPA that the defendants have not demonstrated that ALPA bargained away its statutory rights in negotiating the CBA. Viewed conversely, the Court finds it totally implausible that ALPA would agree to a provision in the CBA stating that Pan Am could "create or acquire an alter ego to avoid the terms and conditions of the Agreement." The consequences of such a provision would clearly undermine the CBA and

would be contrary to law. *See Ry. Labor Executives' Ass'n v. Boston & Maine Corp.*, 808 F.2d 150, 158 (1st Cir.1986) (finding that a provision in a collective bargaining agreement providing that an employer could abolish employee positions in retaliation for employees engaging in activities protected by the RLA would be clearly invalid as contrary to law); *see also Ruby v. TACA Int'l Airlines*, 439 F.2d 1359, 1364 (5th Cir.1971) (finding that a collective bargaining agreement could not reasonably be read to authorize a full-scale unilateral transfer with the attendant consequences for ALPA and the agreement as a whole). The Court finds obviously insubstantial defendants' argument that ALPA's willingness to execute the CBA without its requested language makes it arguable that ALPA agreed that Pan Am could transfer its work to an affiliated non-union entity.

Defendants argue that *Springfield Terminal*, and other cases relied upon by ALPA, are distinguishable in that to the extent that the service being operated by Boston–Maine could be deemed by the court to be a transfer of work from Pan Am to Boston–Maine, these transfers did not follow unsuccessful negotiations with the union. The Court finds that this distinction should affect the result here. That the defendants chose not to attempt to bargain with ALPA prior to starting a 727 operation at Boston–Maine does not support the conclusion that ALPA agreed

9. For purposes of the instant dispute, the CBA provides in relevant part:

*SECTION 1. RECOGNITION AND SCOPE*
\* \* \* \* \* \*
B. Scope
1. Except as provided in subsection 1.B.2, all flying by and for the service of the Company on aircraft owned or leased by and for the Company and utilizing the authority granted under the Company's operating certificate shall be conducted (a) in accordance with the Pan American Airways Corp. operating certificate, (b) by pilots whose names appear on the Pilots' System Seniority List. Chartered flying by and for the Company shall not be on a regular or scheduled basis.
2. Notwithstanding subsection 1.B.1. above, the Company may enter into aircraft interchange agreements with other carriers if such interchange agreements do not result in the furlough of any of the Company's pilots.
Pl.'s Ex. 1.

to Pan Am transferring work traditionally performed by Pan Am to an affiliated non-union entity.

The Court further finds unpersuasive defendants' argument that ALPA could have arbitrated its work diversion claim two years ago when Boston–Maine first sought authority to fly 727 aircraft. ALPA's claim is that Pan Am and Boston–Maine are being controlled by Guilford, and that Pan Am Inc. is merely an intermediary shell entity. Any arbitration award that ALPA could have obtained against Pan Am would have no binding affect on Guilford, Boston–Maine, or Pan Am Inc. because they are not parties to the agreement.

Based on the Court's reading of *Springfield Terminal,* and the other cases cited herein, the Court finds that ALPA has demonstrated that a preliminary injunction is warranted to enjoin the defendants from violating the status quo provisions of the RLA by diverting work from Pan Am to Boston–Maine pending completion of the mandated mediation procedures.

### C. *Interference With Organizational Rights Claim*

"RLA bars employers from engaging in discriminatory actions designed to impede or inhibit employees' exercise of their right to organize for collective bargaining purposes." *Atlas Air,* 232 F.3d at 224. Section 2 of the RLA, Third, provides that employees may select their representatives "without interference, influence, or coercion" of "any" kind. 45 U.S.C. § 152 Third. Section 2, Fourth, further provides that:

> No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees ... or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization.

45 U.S.C. § 152 Fourth.

ALPA argues that the defendants' conduct described herein, in addition to violating the status quo provisions, violates the pilots' rights to organize and be represented by a union. In considering RLA claims under § 2, Third and Fourth, " 'the real question' ... is whether the carrier has discriminated against its employees because they have engaged in activities protected by the RLA." *Atlas Air,* 232 F.3d at 224. In making this determination, the Court should consider whether the carrier's conduct had a legitimate business motivation independent of any effort to discourage employees from exercising their rights under the RLA. *Id.*

Justiciable claims under RLA § 2, Third and Fourth, are more limited than claims brought under the status quo provisions of the RLA. *See Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists & Aerospace Workers,* 915 F.2d 43, 53 (1st Cir.1990). The Supreme Court has long held that the provisions of 45 U.S.C. § 152, Third and Fourth, "address primarily the 'precertification rights and freedoms of unorganized employees.' " *Id.* at 51 (quoting *Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants,* 489 U.S. 426, 440, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989)). Where the union has already been certified, a union's permissible claims under § 2, Third and Fourth, are narrowly circumscribed. The First Circuit has found that judicial intervention in such cases is limited to the following circumstances: (1) where the employer's conduct has been motivated by anti-union animus or an attempt to interfere with its employees' choice of their

collective bargaining representative; or (2) the employer's conduct constitutes discrimination or coercion against that representative; or (3) the employer's conduct involves acts of intimidation that cannot be remedied by administrative means; or (4) the employer engaged in a fundamental attack on the collective bargaining process or a direct attempt to destroy a union. *Id.* (citing cases).

In the Court's view, ALPA's claim that the defendants are engaged in a scheme to shut down unionized Pan Am, and intentionally eliminate ALPA in the process, involves a direct attempt to destroy a union. ALPA's claim is supported by the evidence discussed above, including that: (1) the defendants cited no legitimate business purpose for starting a 727 operation at Boston–Maine, (2) the defendants have already diverted regularly scheduled Pan Am work to Boston–Maine, (3) the defendants intend for Boston–Maine to continue flying the routes now being flown by Pan Am, (4) Fink, the President of Guilford, Pan Am and Boston–Maine has stated his desire to shut down Pan Am and place all of the aircraft currently flown by Pan Am under the Boston–Maine certificate, and (5) Fink has expressed specific anti-union animus and his anticipation of a "smooth" non-union operation.

Since the Court finds that the evidence support's ALPA's claim that the defendants have engaged in a direct attempt to destroy the union, the Court further finds that ALPA's request for injunctive relief is supported by RLA § 2, Third and Fourth.

## II. *Irreparable Injury*

In a case decided under the RLA, the Supreme Court found that "district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable inju-

ry." *Conrail,* 491 U.S. at 303, 109 S.Ct. 2477 (citing *Shore Line* and *Division No. 1, Detroit, Bhd. of Locomotive Eng'rs v. Consol. Rail Corp.,* 844 F.2d 1218 (6th Cir.1988)). In *Conrail,* the Supreme Court noted parenthetically that a status quo injunction was upheld in *Shore Line* without discussing equitable constraints. *Id.*

Nevertheless, defendants insist that ALPA's argument that it need not demonstrate irreparable injury in this case before an injunction may issue is wrong. Defendants cite *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) and *U.S. v. Microsoft Corp.,* 147 F.3d 935 (D.C.Cir.1998), in support of their argument. Those cases, neither of which is decided under the RLA, generally stand for the proposition that a party is not necessarily entitled to a preliminary injunction merely because it has demonstrated a likelihood of success on the issue of whether a statute has been violated. The cases recognize, however, that if Congress intended that a statute confer a right to an injunction once a certain showing has been made, the party need not establish more than the statute specifies. In the context of requests for a status quo injunction under the RLA, the Supreme Court has found that district courts may enjoin violations of the status quo pending completion of required procedures without the customary showing of irreparable injury. The Court declines the defendants' invitation to rule that the Supreme Court was wrong. Accordingly, the Court need not further consider whether the plaintiff is likely to suffer irreparable harm in the absence of a preliminary injunction.

Even if the Court were required to determine whether irreparable harm would result in the absence of a preliminary injunction, however, the Court would so find

in this instance. In the Court's view, the prospect of the complete loss of union work and union jobs to an affiliated non-union entity is plainly irreparable.

## III. *Other Equitable Considerations*

To the extent the Court needs to address the balance of the harms and the effect of an injunction on the public interest, the Court finds that these factors weigh in the plaintiff's favor.

### A. *Balance of the Harms*

As discussed above, the Court finds that the harm to ALPA and the Pan Am pilots in the absence of an injunction is grave. The Court has considered the defendants' arguments and finds them to be without merit.

The evidence shows that the work that the defendants seek to perform through Boston–Maine is the exact same work that is now being performed through Pan Am. While defendants assert that Pan Am has been unprofitable, Nadolny testified that Boston–Maine has also been unprofitable. There is no evidence to support a finding that Boston–Maine's 727 operation, if not enjoined, will be more profitable than Pan Am's for any reason other than that the defendants will avoid Pan Am's obligations under the CBA. Pan Am and Boston–Maine have the same corporate leadership, therefore there is no reason to find that Boston–Maine is better managed than Pan Am. The evidence shows that numerous Boston–Maine employees were formerly employed by Pan Am and that Boston–Maine seeks to employ more Pan Am employees. Moreover, the evidence showed that Boston–Maine's employees are being trained by Pan Am employees.

Defendants protest that Boston–Maine and its employees will be harmed if an injunction is granted because ALPA waited until the eleventh hour to seek to avoid

harm that it proclaimed has been coming since it first opposed Boston–Maine's requests to expand its operations. That argument ignores that Boston–Maine has also known during that same time period that ALPA vigorously opposed Boston–Maine's requests for regulatory approval to start a 727 operation for two years. It should come as no surprise to the defendants that ALPA has sought judicial intervention to stop the defendants, two of which are not bound by the CBA, from bringing the harm that it feared to fruition.

Defendants' remaining assertions of harm similarly lack merit. Defendants argue that Pan Am employees may be harmed if they lose an opportunity to become employed by Boston–Maine once Pan Am shuts down. It is disingenuous to suggest that Pan Am's unionized employees will suffer greater harm from an injunction that prohibits the defendants from diverting Pan Am's existing work to Boston–Maine because those employees might lose opportunities to "start over" at non-union Boston–Maine.

The Court further finds hollow defendants' argument that ALPA should not be granted an injunction because it has not presented evidence that Pan Am will stay in existence beyond October 31st. This argument turns logic on its head. Pan Am's owners, not its employees, determine how long it operates. Despite this, Pan Am's unionized employees had a reasonable expectation under the RLA that Pan Am would not be replaced by a duplicate operation at an affiliated non-union airline. For these reasons, the Court finds that the balance of the harms favors the grant of an injunction.

### B. *Public Interest*

The Court further finds that the public interest favors granting immediate relief

to protect the statutory rights of ALPA and the Pan Am flight crewmembers it represents and to uphold the policies behind the RLA. The Court finds no evidence that an injunction will have an adverse affect on the public interest.

The evidence shows that the defendants jointly control the scheduling and operation of Pan Am's and Boston–Maine's flights, and that Pan Am's flying has been reduced in conjunction with the expansion of the Boston–Maine 727 operation. There is no evidence that Pan Am's existing 727 aircraft operation is not able to handle all of the defendants' 727 flying needs for the foreseeable future.

The Court rejects defendants' argument that there could be disruption to fare-paying passengers' travel arrangements if Pan Am is barred from exercising its authority to subcontract with other carriers, including Boston–Maine, from time to time to ensure smooth service. ALPA does not argue that Pan Am should be prohibited from subcontracting with other carriers as necessary to provide service to Pan Am's passengers. Substantial evidence has been provided that at least some Pan Am flying has been diverted to Boston–Maine for reasons other than a flight crew shortage or mechanical failure. If granted, a preliminary injunction would merely prohibit the defendants from using its non-union affiliate to perform work that unionized Pan Am has traditionally performed, and is fully capable of performing. Accordingly, the Court finds that the public interest favors the grant of an injunction.

### Conclusion

For the reasons set forth above, the Court recommends that ALPA's motion for a preliminary injunction (document no. 3) be granted, and the parties ordered to maintain the pre-dispute status quo during the statutorily-mandated dispute resolu-tion procedures. Specifically, the Court recommends that, upon the posting of adequate security by ALPA, that the defendants, Pan American Airlines, Inc., and their officers, agents, servants, employees, attorneys, and those persons acting in active concert or participation with them who receive actual notice of this order by personal service or otherwise be ordered to take the following acts:

1. Restore to the status quo rates of pay, rules and working conditions of the Pan Am flight crewmembers as they existed on July 15, 2004, including but not limited to, all those embodied in the Pan Am–ALPA collective bargaining agreement, until all required bargaining, mediation and dispute resolution procedures of the RLA are exhausted.

2. Refrain from using Boston–Maine, or any other affiliated operation, to operate B–727s or other large jet aircraft in service traditionally performed by Pan Am and that Pan Am is capable of performing.

3. Refrain from transferring to Boston–Maine any aircraft from the Pan Am certificate to the Boston–Maine certificate.

Any objections to this Report and Recommendation must be filed within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. *See Unauthorized Practice of Law Comm. v. Gordon,* 979 F.2d 11, 13–14 (1st Cir.1992); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986). Sept. 17, 2004.